# EXHIBIT "A"

# EXHIBIT "A"

# itriaventures™

# FUTURE RECEIVABLES SALE AGREEMENT

**Note: These Purchase and Sale Terms ("Purchase and Sale Terms") form a part of and are incorporated into this Future Receivables Sale Agreement ("Agreement"), which continues on the next page.** **Case ID:** 1050139

**Purchaser:** Itria Ventures LLC, a Delaware limited liability company ("**Purchaser**").

**Merchant(s):** MARQUIS CATTLE COMPANY

a Montana Corporation ("**Merchant**" or "**you**").

**Contract Date:** December 21 , 2021 .

**Purchase Price:** Six Hundred Thousand Dollars ($ 600,000.00 ).

The purchase price ("**Purchase Price**") is a gross amount before application of fees ("**Fees**"). The amount funded to you under this Agreement ("**Funded Amount**") will be net of the Fees specified below.

**Amount Sold:** Seven Hundred Fifty Thousand Dollars ($ 750,000.00 ).

This is the amount of your Future Receivables purchased by Purchaser under this Agreement ("**Amount Sold**"). Please refer to Sections 2(a) and 2(b).

**Purchased Percentage:** Five Point Five percent ( 5.5 %). This is the percentage of your Future Receivables that Purchaser will receive until the Merchant has delivered the Amount Sold; ("**Purchased Percentage**"), on the periodic basis specified below.

**Periodic Amount:** Twelve Thousand Five Hundred Dollars ($ 12,500.00 ). This is the periodic amount to be remitted to Purchaser every every week ("**Periodic Amount**"), subject to monthly True-Up against your actual Purchase Percentage of Future Receivables, as provided in Section 5.

**Fees:** Your Fees under this Agreement total Twenty Four Thousand Five Hundred Dollars ($ 24,500.00 ). This amount will be deducted from your Purchase Price specified above, per Section 3(a). Additional fees may be payable after the Contract Date. Please refer to Section 3(b).

**Funded Amount:** Five Hundred Seventy Five Thousand Five Hundred Dollars ($ 575,500.00 ). This amount is the Purchase Price *less* Fees, and is the net amount funded to you under this Agreement.

**Guaranty of Performance**
CSM (see page 15) BJM

**Guarantor(s):** CORY SHANNON MARQUIS & BECKIE JO MARQUIS ("**Guarantor**").

**ALL PARTIES AND GUARANTOR AGREE TO CONDUCT THIS TRANSACTION BY ELECTRONIC MEANS AS FURTHER SPECIFIED IN THE AGREEMENT**

This **FUTURE RECEIVABLES SALE AGREEMENT** ("Agreement"), dated as of the date specified on the prior page, is made by and between **Itria Ventures LLC**, a Delaware limited liability company ("Purchaser"), and the merchant(s) identified as "Merchant" in the Purchase and Sale Terms and on the signature page hereof (collectively, "Merchant" or "you").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties now intend to be legally bound and agree as follows:

**1. Fundamental Terms, Conditions and Waivers.** This is a contract for the purchase and sale of Future Receivables. Purchaser is buying a stated amount of the Merchant's Future Receivables (the Amount Sold) for the Purchase Price set forth on the front page of this Agreement. Purchaser's right to receive payments under this Agreement is contingent on your receipt of Future Receivables. To this end, you have the right to request a reconciliation ("True-Up") of Periodic Amount remittances made in any calendar month against your actual Future Receivables for that month using the Purchased Percentage method, provided you comply with the requirements set out in Section 5. The term "Future Receivables" is defined in Section 2(c). By signing this Agreement, you confirm to Purchaser that: (1) the representations, warranties and covenants set forth in Section 6 are reasonable and necessary to effect the purposes of this Agreement and to afford Purchaser the benefit of its bargain pursuant to this Agreement; and (2) you will use the funded amount solely for business purposes and in the operation of your business; and that you will operate the Merchant business in good faith.

By signing this Agreement, you confirm that the purchase and sale of Future Receivables contemplated by this Agreement does not constitute a loan transaction. Because the transactions under this Agreement are a sale and not a loan, there is no term, interest rate or any annual percentage rate (APR). In addition, because this transaction is not a loan, Purchaser has assumed the risk that Future Receivables may not be available for remittance to Merchant. Correspondingly, you acknowledge that Merchant's representations, warranties and covenants in this Agreement that are designed to give Purchaser a reasonable and fair opportunity to receive the benefit of its bargain.

You acknowledge that you have been advised by Purchaser to consult with legal counsel, and that you have been afforded a full opportunity to consult with legal counsel. You hereby affirm to Purchaser that you have either consulted with such counsel or voluntarily elected not to do so. Without limiting the foregoing, you further acknowledge that Purchaser has advised you to consult with legal counsel with respect to the waivers set out directly below:

<u>**CERTAIN WAIVERS.**</u> **BY SIGNING THIS AGREEMENT, YOU ALSO ACKNOWLEDGE THAT YOU HAVE PERMANENTLY WAIVED THE RIGHTS (1) TO START OR JOIN A CLASS ACTION IN ANY CAPACITY; (2) TO TRIAL BY JURY; AND (3) TO RAISE DEFENSES AND COUNTERCLAIMS, TO THE MAXIMUM EXTENT PERMITTED BY LAW.**

Purchaser will conduct a recorded call prior to funding (the "**Funding Call**"). On this call, Purchaser will go over the Agreement and certain key requirements, including that this Agreement must be duly signed by Merchant by utilizing the electronic signature service selected by Purchaser (the "**E-Signature**" or to "**E-sign**" or "**sign**"). In addition, each individual listed as a "Guarantor" on the front page of this Agreement (collectively, "**Guarantor**") must duly sign the Guaranty of Performance (the "**Guaranty**") on the signature page hereof. You hereby affirm that all information provided to Purchaser is truthful and accurate. This Agreement will not become effective unless and until the Agreement is funded by Purchaser (such date, the "**Effective Date**"). Purchaser's obligation to fund this Agreement is subject to due diligence review at Purchaser's sole discretion.

By signing this Agreement, you further acknowledge that the execution and performance of this Agreement by Merchant will not conflict with or breach any other agreement or obligation of Merchant including without limitation the breach of any loan or other financing agreement previously entered into by Merchant.

**2. Purchase and Sale of Future Receivables.** (a) *Title to Future Receivables.* In exchange for the Purchase Price, you hereby irrevocably, unconditionally and absolutely sell, assign and transfer to Purchaser all (100%) of Merchant's right, title and interest (whether legal, equitable or beneficial) in and to the Amount Sold out of Merchant's Future Receivables, on the terms and conditions specified herein. The purchase and sale of Future Receivables under this Agreement shall take place in New York. As of the Effective Date, the purchased Future Receivables shall be absolutely and unconditionally transferred to, owned by, controlled by, and vested

solely in Purchaser, subject to the terms and conditions hereof. This Agreement is a binding legal contract and shall become effective as of the Effective Date. You agree to deliver or cause to be delivered the Amount Sold from your Future Receivables to Purchaser, as described in this Agreement. Until Purchaser has received the Amount Sold in full (including the return of any remittances set aside or returned by Purchaser for any reason), you agree that:

- **You will remit Future Receivables to Purchaser as specified in this Agreement.**
- **You will not sell or transfer your Future Receivables, assets or business or take any action that would interfere with Purchaser's right to receive Future Receivables.**
- **You will not enter into any loan, factoring, merchant cash advance or other financing agreement without Purchaser's prior written consent.**
- **You will ensure that all information and documents provided to Purchaser are correct and accurate.**
- **You will immediately update Purchaser on any material change in this information or your business' condition.**

(b) *Purchase and Sale Terms*. The Purchase and Sale Terms, set out on the front page of the Agreement initialed by Merchant, form a part of this Agreement and are further described herein. The **"Purchase Price"** is the gross dollar amount Purchaser is paying for Merchant's Future Receivables, (defined in subparagraph(c) below). The **"Amount Sold"** is the dollar value of the Future Receivables sold to Purchaser and that are to be remitted to Purchaser out of your Future Receivables, as provided herein. The **"Purchased Percentage"** is the percentage of Future Receivables that Purchaser will receive on the periodic basis specified on the front page of the Agreement, until the Amount Sold (plus any additional fees and charges incurred under this Agreement) has been fully delivered to Purchaser. The **"Periodic Amount"** is the amount the parties have agreed that, for administrative convenience, other than for credit card split deals (as evidenced by a separate writing (including email) between Merchant and Purchaser), you will remit to Purchaser on the periodic basis specified on the front page of the Agreement, subject to reconciliation (True-Up) against your actual Future Receivables on a monthly basis, as set forth in Section 5. The **"Funded Amount"** is the amount you will receive upon funding of this Agreement, and is equal to the Purchase Price, less total Fees, which are set forth on the front page of this Agreement and specified in Section 3(a).

(c) *Future Receivables*. **"Future Receivables"** means any and all: (i) funds that Merchant receives from its customers using credit cards, charge cards, debit cards, prepaid cards, benefit cards, or similar cards to purchase Merchant's products and/or services (including without limitation any such funds that are processed by Merchant's card processor(s)); (ii) funds that Merchant receives from the its customers of cash, checks, money orders or other electronic transfers or other forms of payment to purchase Merchant's products and/or services; (iii) accounts, future accounts, contract rights, choses in action and any other rights to payment; and (iv) insurance proceeds received by Merchant (up to the full Amount Sold less total remittances under this Agreement) in connection with any of the foregoing, in each case as applicable. "Future Receivables" also includes the Future Receivables of Merchant's subsidiaries and affiliated companies and, upon a Material Breach, of any (x) new or existing company owned or controlled by Merchant or any Guarantor (collectively, an **"Other Business"**), (y) any new or existing company, whether owned or controlled by Merchant or Guarantor or any third party, to which all or a material portion of the business or assets of Merchant are sold or otherwise transferred (collectively, a **"Successor Company"**) or (z) any affiliate of any of the foregoing, in each case without the express prior written consent of Purchaser.

(d) *Approved Accounts*. Please specify all of Merchant's business bank accounts below, and also designate the account Purchaser should use to fund the Agreement. If no account is so designated, Purchaser will fund into the first account listed below.

| Account #1*      * REQUIRED | Account #2 | Account #3 |
|---|---|---|
| Deposit Funds / Withdrawals | Deposit Funds / Withdrawals | Deposit Funds / Withdrawals |
| Bank Name: FIRST INTERSTATE BANK | Bank Name: _____ | Bank Name: _____ |
| Routing #: 092901683 | Routing #: _____ | Routing #: _____ |
| Account #: 8500484806 | Account #: _____ | Account #: _____ |

| Account #4 | Account #5 | Account #6 |
|---|---|---|
| Deposit Funds / Withdrawals | Deposit Funds / Withdrawals | Deposit Funds / Withdrawals |
| Bank Name: _____ | Bank Name: _____ | Bank Name: _____ |
| Routing #: _____ | Routing #: _____ | Routing #: _____ |
| Account #: _____ | Account #: _____ | Account #: _____ |

You hereby authorize Purchaser to debit or ACH your Approved Accounts (as defined) on the periodic basis and in the amounts specified herein, without further notice to or approval by you. As used herein, **"Approved Accounts"** means all (i) the Merchant accounts listed above; (ii) other Merchant business accounts; (iii) on credit card split deals, Merchant's authorized credit card processors; and (iv) upon the occurrence of a Material Breach, all other business accounts or credit card processing accounts of Merchant or any Other Business, Successor Company or Guarantor. **You acknowledge that Purchaser shall have full read-only access to all Approved Accounts while this Agreement is in effect.**

**3. Fees Deducted at Funding; Additional Fees. (a)** *Fees Deducted from Purchase Price.* The Fees specified in this <u>Section 3(a)</u> will be deducted from Purchase Price in order to calculate the Funded Amount paid to you at closing. The Fees  so deducted from the Purchaser Price are: (1) a **"Platform Fee"** of _____Four Percent (4%)_____ % of the Purchase Price, which represents Purchaser's administrative and online platform costs; (2) **an underwriting fee of $** _Five Hundred Dollars   ($500)_ , which represents Purchaser's underwriting and UCC filing costs; (3) if a lock box is required by Purchaser, a fee of $12.50 which represents Purchaser's cost to set up the lock box; and (4) any fees relating to the referral of Merchant to Purchaser for financing, and/or any remaining undelivered Amount Sold by Merchant or any of Merchant's affiliates to Purchaser or any of Purchaser's affiliates under any Future Receivables Sale Agreement, and/or any amount owed in connection with any other financing between Purchaser (or affiliate) and Merchant (or affiliate). **The aggregate Fees deducted from the Purchase Price are specified on the front page of this Agreement as the Funded Amount, namely the net amount paid to Merchant upon funding of this Agreement. Please note that these Fees are not Future Receivables payments and hence will not reduce the Amount Sold.**

**(b)** *Additional Fees.* Merchant authorizes Purchaser to charge Merchant the following fees, without notice: (1) <u>Returned Item Fee</u>: a returned item fee of **twenty-five dollars ($25.00)** (or lower amount if expressly required by law) per return will be assessed if a check, draft, wire transfer, ACH or similar instrument issued by Merchant or an individual that signs this Agreement is not honored or cannot be processed, or an electronic debit is returned or cannot be processed (each, a **"Returned Item"**). Purchaser may assess this fee each time remittance of Future Receivables is returned or cannot be  processed, even if it is later honored following resubmission. Any check, draft or similar instrument may be collected electronically if returned for insufficient or uncollected funds; (2) <u>Electronic Access Fee</u>: If Merchant fails to assist Purchaser in maintaining access to electronic bank information for the Approved Accounts, Merchant will be charged **five percent (5%)** of the remaining Amount Sold. Merchant acknowledges that these fees bear a reasonable relationship to the damages incurred by Purchaser and are reasonable in amount. (3) <u>Costs of Collection</u>, as specified in <u>Section 8.</u>(4) <u>Lock Box Monthly Fee (if required by Purchaser)</u>: a monthly fee of $30.00 to administer the lock box. **Please note that these fees are not Future Receivables payments and hence will not reduce the Amount Sold.**

**4. Remittance Methods.** Merchant shall remit the Applicable Amount (as defined) of Future Receivables to Purchaser in one of the following methods specified below. Merchant agrees to provide any and all authorizations, approvals, documents and assistance required to establish or change a remittance method if requested by Purchaser. You agree that Merchant will not change remittance methods or permit any event to occur that could cause a diversion of any of Merchant's Future Receivables from the specified remittance account to any other account or entity. **You will provide Purchaser and/or its authorized agents with all information, authorizations and passwords that are necessary for and/or Service Provider (as defined) to verify Merchant's receivables, receipts, and deposits.** All Future Receivables shall be remitted on the first business day of the applicable periodic period specified in the Purchase and Sale Terms, in the Applicable Amount. As used herein, the **"Applicable Amount"** means the Applicable Amount of Future Receivables to be periodically remitted to Purchaser as specified below, subject to the True-Up in <u>Section 5</u> for transactions using the ACH remittance method, as per clause (1) below.

(1) *ACH/Direct Debit.* Unless otherwise agreed with Merchant, Purchaser will withdraw the Periodic Amount by initiating a debit via the Automatic Clearing House ("ACH") system to your Approved Account. You hereby authorize Purchaser to debit the designated amount from your Approved Account(s) (as defined) on the periodic basis specified above, until the Amount Sold and any other fees and charges incurred under this Agreement have been received in full by Purchaser. You understand and acknowledge that, due to the timing of the receipt of data by Purchaser and the operations and rules of the ACH system as determined by the National Automated Clearing House Association ("NACHA"), Purchaser will not be able to confirm receipt of Future Receivables until after the actual debit. **You agree to promptly provide any assistance requested by Purchaser and/or a financial institution to confirm to that you have authorized Purchaser to initiate debit via ACH to your Approved Account.**

(2) *Direct Split.* For direct split deals (or direct split components of deals), in which Future Receivables are remitted to Purchaser by your approved credit card processor, as separately agreed between you and Purchaser, the Purchased Percentage method shall Purchaser's exclusive method of remittance so long as a Material Breach has not occurred. You agree to use a credit card processor acceptable to Purchaser and to promptly enter into an agreement with the approved credit card processor, pursuant to which your credit card processor will remit the Purchased Percentage directly to Purchaser, rather than to you, until the Amount Sold and any other fees and charges incurred under this Agreement have been received by Purchaser in full.  Purchaser may require you to use a different credit card processor or change credit card processors at the Purchaser's sole discretion.  You agree to promptly enter into a new agreement with a credit card processor to effectuate this Agreement upon Purchaser's request.  You acknowledge and agree that

4

processor may provide Purchaser with Merchant's credit card, debit card and other payment card and instrument processing history, including without limitation Merchant's chargeback history and any communications about Merchant received by processor from a card processing system, as well as any other information Purchaser deems pertinent. You understand that Purchaser does not have any power or authority to control processor's actions with respect to the authorization, clearing, settlement and other processing of transactions and that Purchaser is not responsible for processor's actions If applicable, you also agree to forward to Purchaser, on a daily, weekly, bi-weekly or monthly (as applicable) basis to by Purchaser (or any third party designated by Purchaser), all electronic payment transaction records from Merchant's point of sale system relevant to Future Receivables transactions (including, but not limited to, activity on Visa, MasterCard, American Express, Discover, Diners Club, JCB, or ATM Debit Cards and check truncation records).

(3) *Lockbox*. You hereby authorize Purchaser, upon written notice to you, to debit the Applicable Amount from a deposit account to be established by Merchant at Purchaser's written request that is approved by Purchaser using the Lockbox method (a "**Lockbox Account**"). Merchant acknowledges and agrees that any funds deposited into the Lockbox Account by Merchant's Processor will remain in the Lockbox Account until the Applicable Amount is periodically withdrawn by Purchaser.

**5. Monthly True-Up.**   Once every month (the "**True-Up Month**"), provided you have complied with the requirements set forth in this <u>Section 5</u>, you have the right to request a reconciliation (a "**True-Up**") of your Periodic Amount remittances (the "**Periodic Amount Remittances**") made in the immediately prior calendar month (the "**Prior Month**") against the Purchased Percentage of your actual Future Receivables received for that month (the "**Purchased Percentage Amount**"). For example, with respect to payments made in January (the Prior Month), you have the right to request a True-Up of those payments in February (the True-Up Month). The True-Up does not apply to direct split deals for so long as Purchased Percentage is Merchant's exclusive method of remittance. **This** <u>Section 5</u> **supplements the Purchase and Sale Terms set out on the front page of this Agreement and in** <u>Section 2(b)</u>**, and provides important rights to Merchant.**

You understand and agree that your request for a True-Up will not be effective, and that Purchaser will not be required to adjust your Periodic Amount Remittances against your Future Receivables, unless Purchaser (i) has received all Materials (as defined), (ii) in the manner specified below, (iii) by the end of the True-Up Month (collectively, the "**True-Up Conditions**"). More specifically, the True-Up Conditions are:

(1) *Materials*. Purchaser must receive true and complete copies of the Materials for the Prior Month. As used herein, "Materials" means, collectively: (i) Merchant's bank statements for each Approved Account; (ii) Merchant's merchant processing (credit card) statements; (iii) Merchant's accounts receivable (A/R) aging statements; (iv) any other payment records or receipts of Merchant that evidence Merchant's Future Receivables (please see definition at the end of <u>Section 2(c)</u>); and (v) any other documentation or information relating to Future Receivables for the Prior Month that Purchaser may reasonably request in writing.

(2) *Timing*. Purchaser must receive the Materials not later than the end of the True-Up Month.

**It is your responsibility to comply with all True-Up Conditions not later than the end of the True-Up Month.** If you have requested a True-Up and timely complied with all True-Up Conditions, Purchaser shall calculate whether the total Periodic Amount Remittances in any Prior Month were more or less than the total Purchased Percentage Amount for that month. Purchaser shall then, not later than ten (10) business days after the end of the True-Up Month, initiate an ACH to the Approved Account of Merchant, either as (A) a credit equal to the difference between the Periodic Amount Remittances and the Purchased Percentage Remittances or (B) a debit equal to the difference between the Purchased Percentage Remittances and the Periodic Amount Remittances.

Purchaser also has a right to request a True-Up.  To facilitate Purchaser's True-Up, Merchant agrees to provide the Materials to Purchaser by the end of the True-Up Month upon Purchaser's request.  Merchant also agrees to inform Purchaser during the True-Up Month if total remittances during the Prior Month were less than Purchaser's share (Purchased Percentage) of Merchant's Future Receivables for this period.

**If (i) you do not comply with the True-Up Conditions on a timely basis, or (ii) Merchant is in Material Breach of the Agreement at the time of the True-Up request, then (1) Merchant expressly waives its right to a True-Up under this** <u>Section 5</u> **for the relevant Prior Month and (2) the Purchased Percentage Amount for the applicable Prior Month will be deemed to equal the Periodic Amount Remittances for that month.**  Merchant hereby expressly authorizes Purchaser to effect the credit or debit to Merchant's Authorized Account as provided above and in the amounts specified above. Merchant further acknowledges and agrees that, absent mathematical

or technical error, the amounts calculated by Purchaser shall be conclusive. **You acknowledge that the foregoing limitations and requirements are fair and reasonable in order to allow Purchaser to process payment reconciliation requests, and that Purchaser would not have entered into this Agreement without these provisions.** In the event that Purchaser determines that a True-Up is appropriate for three successive months, the parties may discuss an adjustment to the Periodic Payment amount, subject in all cases to Purchaser's discretion and mutual written agreement.

**6. REPRESENTATIONS, WARRANTIES AND COVENANTS.** Merchant, jointly and severally on behalf of itself and any subsidiary or affiliate of Merchant whose accounts are included in Future Receivables, hereby represents, warrants and covenants that, as of the date of the Agreement and at all times thereafter until the Amount Sold, together with any fees, charges, and Costs of Collection as applicable, has been remitted to Purchaser in full:

### A. Provisions Relating to the Integrity of this Agreement.

(i)      You will use all amounts funded under this Agreement solely for general working capital purposes in Merchant's business, and for no other purpose.

(ii)      Merchant's Future Receivables are not subject to any claims, charges, liens, restrictions, encumbrances or security interests of any nature whatsoever, unless expressly permitted by Purchaser or under this Agreement.

(iii)      You hereby confirm to Purchaser that this Agreement has been duly E-Signed by Merchant in accordance with Section 1 above, and that all of your signatures on this Agreement are true and genuine.

(iv)      You will not retain any company or individual for the purpose of negotiating a repurchase of the Future Receivables at a discount or otherwise changing the obligations under this agreement, or engage any legal or financial professional for advice regarding restructuring, renegotiating, or defaulting on any debt or other obligation; provided this provision shall not be construed to limit Merchant's right to consult with or retain legal counsel for any purpose in connection with this Agreement.

(v)      You will promptly sign (including via E-Signature) any and all documents that Purchaser, in its sole discretion, deems necessary (including signing up for electronic-inquiry-only access to Merchant's bank and processing accounts and providing Purchaser with any necessary information, authorizations and passwords in connection therewith) and provide Purchaser copies of all documents related to Merchant's card processing activity or financial and banking affairs within five (5) days of a request by Purchaser.

(vi)      You acknowledge that Merchant has received the benefit of services performed in the State New York, and has transacted and will continue to transact business within the State of New York during the term of this Agreement.

(vii)      You will not take any action that would or would be reasonably likely to breach any of the representations, warranties and covenants in this Section 6, and you agree to immediately notify Purchaser by phone and email of any breach or potential breach any provision of this Agreement.

**(viii)  You acknowledge that (a) the representations, warranties and covenants set forth in this Section 6 are fair and reasonable and designed to provide Purchaser a fair opportunity to receive the benefit of its agreement with Merchant; (b) are an essential component of the understanding and agreement between the parties; and (c) Purchaser would not have funded your business pursuant to this Agreement but for such provisions.**

### B. Provisions Relating to the Remittance of Future Receivables.

(i)      You will remit Future Receivables to Purchaser up to the Amount Sold, together with any fees and charges incurred and any Costs of Collection as applicable, in accordance with the provisions of this Agreement, and you will not directly or indirectly cause the diminution of Future Receivables.

(ii)      You will not change the account name, account number, password or other access information relating to accounts from which ACH or electronic check payments are to be made or relating to any Processor without Purchaser's prior written approval in each case.

(iii)      You will immediately provide Purchaser and/or Service Provider with relevant account information, passwords and/or codes in order to ensure that Purchaser has full read-only access to your Approved Accounts.

(iv)      Until the Amount Sold has been received in full by Purchaser, you will not take any steps to avoid or circumvent your obligation to remit Future Receivables to Merchant, including without limitation: (w) taking any action that might discourage the use of credit cards, debit cards or other payment cards by Merchant, and you will not permit any event to occur that may have an adverse effect on the use, acceptance or authorization of credit cards, debit cards, or other payment cards (x) changing or adding credit card processors without the prior written approval of Purchaser, (y) amending or terminating the processing agreement with the credit card processor approved by Purchaser or (z) putting a stop order or blocking any ACH or other remittance of Future Receivables to Purchaser, or taking any voluntary action that results in a stop order or block.

(v)      You will make reasonable efforts to inform Purchaser if the Approved Account lacks sufficient funds such that a debit by Purchaser will result in a bounced or rejected debit.

(vi)      You will permit Purchaser or its agent to conduct a site inspection of Merchant's business, including an inspection of Merchant's credit card terminals, without prior notice to you.

6

**C.    Provisions Relating to the Conduct of Merchant's Business.**

(i)    You will continue to conduct Merchant's business consistent with past practice and will not change its business location(s) or name(s) or the location of any Collateral (as defined) or temporarily close any location without Purchaser's prior written approval Purchaser.

(ii)    You will not permit any other person or company, including without limitation a franchisor or subcontractor, to assume or take over the operation and/or control of Merchant's business or business location(s).

(iii)    You have no intention to, and, until the Amount Sold has been remitted in full to Purchaser, you will not, (a) sell, transfer, pledge or encumber Merchant's ownership interest (e.g. stock or membership interest), assets or business to any person or entity, (b) enter into any transaction that results in any change in voting control, ownership control or effective control of the business or assets of Merchant, or (c) sell, assign, transfer or cancel Merchant's commercial lease or any material license to any person or entity.

(iv)    You have not sold, pledged, transferred or otherwise encumbered the Future Receivables or any portion thereof to another party, and will not do so until Purchaser' receipt in full of the Amount Sold of Future Receipt, plus any fees or charges as provided herein, including any Costs of Collection, other than in connection with a financing approved by Purchaser in writing beforehand.

(v)    You will not take any action that will result in any of your Approved Accounts being restrained by or on behalf of any third-party.

(vi)    You will not incur indebtedness, either (x) on behalf of Merchant, or (y) any principal or affiliate if this could result in the diminution or diversion of Future Receivables, including without limitation receivables financing or bank or other debt, excluding trade payables and other such indebtedness incurred in the ordinary course of Merchant's business.

(vii)    You have not and will not incur any, material liabilities not disclosed to Purchaser in writing, either on behalf of Merchant or any principal or affiliate that would result in the diminution, encumbrance, or diversion of Future Receivables.

**D.    Provisions Relating to the Information and Documents Provided to Purchaser.**

(i)    All information and documentation you have provided to Purchaser prior to the funding of this Agreement is true and complete, including without limitation the application, the Funding Call, accounts receivable (A/R) aging statements, all other financial documents provided to Purchaser (including without limitation the Materials provided to Purchaser in connection with the True-Up in Section 5) and Approved Account information, are true and correct and accurately reflect Merchant's financial condition and results of operations.

(ii)    You have disclosed to Purchaser all material information and documents relating to its business, cash flow revenues and liabilities (including without limitation: pending or threatened claims or lawsuits, contingent liabilities, and actual or potential claims under contracts or purchase orders). No information or documents so disclosed contains any untrue or misleading statement of a material fact or omits to state a material fact necessary to make the information contained therein not misleading.

(iii)    You will immediately inform Purchaser if and as soon as: (a) a Material Breach has occurred or is likely to occur; (b) any of the information specified in in this subparagraph(D) is no longer true and correct and no longer accurately reflect Merchant's financial condition and results of operations; (c) a judgment or lien or levy of any kind is entered against Merchant or its business or assets or any Guarantor; (d) Merchant or any Guarantor is the subject of any pending or threatened lawsuit or arbitration; (e) Merchant or any Guarantor engages any legal or financial professional for advice regarding restructuring, renegotiating, or defaulting on any debt or other obligation, whether through bankruptcy or another process; (f) Merchant or any Guarantor becomes aware of any potential filing against Merchant including without limitation any bankruptcy or legal petition, or (g) there is any other material adverse change in the business, financial condition or prospects of Merchant.

**E.    Other Representations, Warranties and Covenants.**

(i)    Merchant is financially solvent (*i.e.*, the value of its assets is more than its liabilities) as of the Effective Date.

(ii)    Neither Merchant nor any of its principals (including any Guarantor) has filed bankruptcy petition prior to the Effective Date, and as of the Effective Date, is not contemplating filing a bankruptcy, petition, declaring insolvency, seeking reorganization, making of a general assignment for the benefit of creditors, or commencing any other similar action, or contemplating the suspension of or closing Merchant's business and has not engaged any legal or financial professional to seek advice regarding filing bankruptcy or any similar reorganization process.

(iii)    You have and are in compliance with all permits, licenses, approvals, consents and authorizations necessary to conduct Merchant's business and will timely pay all necessary taxes, including but not limited to employment and sales and use taxes, and shall timely make any payments that Merchant is required to make pursuant to, and in accordance with the requirements of, any tax payment programs in which Merchant participates. You conduct your business in compliance with all applicable law.

(iv)    You currently have and will maintain insurance in such amounts and against such risks as are customary and necessary to protect Merchant's business, will not reduce any existing insurance coverage, and will promptly show proof of such insurance upon demand.

- **F.** **Representations, Warranties and Covenants of both Parties.** Each party hereby represents, warrants and covenants that:
    (i)    such party has duly authorized the execution, delivery and performance of this Agreement, including without limitation the execution of this Agreement by electronic means;
    (ii)    the execution delivery or performance of this Agreement will not (i) conflict with any other agreement, commitment or obligation of such party or any court order, administrative order or decree, law or regulation to which Merchant or any of its material subsidiaries is a party or by which it is bound; or (ii) require the consent of any individual, entity or governmental or regulatory agency;
    (iii)    such party will reasonably cooperate with the other party in order to fulfill the objectives of the transactions contemplated by this Agreement.

**7. Material Breach.**

    **A.**    **Material Breach.** Any of the following actions taken directly or indirectly by or on behalf of Merchant will constitute a "Material Breach," without any prior notice from Purchaser:
    (i)    The breach of any representation, warranty, covenant or agreement set forth in this Agreement;
    (ii)    Merchant interferes with Purchaser's right to collect the Amount Sold;
    (iii)    Except as expressly otherwise provided herein, Merchant becomes subject to any civil judgment or garnishment following the date of the Agreement;
    (iv)    Merchant takes any affirmative steps (including, without limitation, executing a term sheet or definitive documentation) or threatens to take any action prohibited by this Agreement that, if effected, would constitute a Material Breach.

    **B.**    **Limitations on Material Breach.** Notwithstanding any other provision of this Agreement,
    (i)    If the aggregate Future Receivables remitted to Purchaser pursuant to this Agreement are less than the stated Amount Sold despite Merchant's best efforts to operate its business in compliance with this Agreement in good faith, and Merchant has not violated any other provision of this Agreement, such diminution of Future Receivables shall not of itself be deemed a Material Breach.
    (ii)    The filing for bankruptcy or insolvency of Merchant is not in itself Material Breach of this Agreement.

**8. Purchaser Remedies upon Material Breach.** Merchant agrees that, upon the occurrence of a Material Breach, Purchaser may, and Merchant hereby authorizes Purchaser to, pursue any and all of the following remedies, to the extent permitted by law, without prior notice to Merchant:
    (a)    Purchaser shall be entitled to receive all Contract Damages (as defined) from Merchant.
    (b)    Purchaser will be entitled to recover from Merchant all Costs of Collection.
    (c)    Purchaser may withdraw funds from any of Merchant's bank accounts, including any Approved Account, by ACH, up to an amount equal any Amount Sold, *plus* unpaid fees and charges under this Agreement, if any, and Purchaser's costs and expenses relating to this Agreement (including without limitation, all Costs of Collection).
    (d)    Purchaser may exercise any and all remedies available, including but not limited to remedies under the Uniform Commercial Code (the "UCC") of the applicable jurisdiction including without limitation: (1) freezing of Approved Accounts, (2) levying or foreclosing on Approved Accounts, and (3) seizing Collateral in any Approved Account or at the business location of Merchant or any Other Business, Successor Company or Guarantor, as applicable, including seizure by local sheriff and/or marshal.
    (e)    Without limiting the foregoing, Purchaser shall also be entitled to all remedies available to it at law or in equity.

**You acknowledge that Purchaser has purchased any and all interests in the Amount Sold of Future Receipts and Merchant has no further interest of any kind in the Amount Sold of Future Receipts. The Amount Sold of Future Receipts and any other fees and charges under this Agreement shall not be subject to the application of or deduction for any claim, set-off, disability, defense (whether substantive or procedural) or counterclaim of Merchant. This Agreement and each of Your obligations under this Agreement shall remain in effect until Purchaser's receipt in full of the Amount Sold of Future Receipts, plus any fees or charges as provided herein, including any Costs of Collection. Upon the occurrence of any Material Breach, you hereby (1) acknowledge and agree that Purchaser shall be entitled to receive the Contract Damages from Merchant; and (2) until the Amount Sold and any other fees and charges incurred under this Agreement have been received in full by Purchaser, irrevocably and unconditionally (i) appoint Purchaser as Merchant's agent coupled with an interest and attorney-in-fact with full authority to take any action or execute (via E-Signature or otherwise, "execute") any instrument or document in the name of Merchant, solely for the purpose of securing the**

Contract Damages or otherwise to enforce its rights with respect to any Collateral and (ii) acknowledge that Purchaser may pursue any remedy available at law (including those available under the provisions of the UCC) or in equity to enforce any agreements or satisfy any obligations to Purchaser, and includ- ing without limitation freezing Merchant's credit card processing accounts and assigning any invoices evidencing accounts receivable purchased hereunder to Purchaser. As used herein, **"Contract Damages"** means an amount equal to the Amount Sold, less all prior receipts of Future Receivables by Purchaser plus any applicable fees and charges under this Agreement; and **"Costs of Collection"** means, as permitted by law, any and all costs, fees and expenses, including reasonable attorneys' fees and other professional fees, marshal fees, sheriff fees and disbursements incurred by Purchaser after any Material Breach, in connection with the defense, protec- tion or enforcement of Purchaser 's rights under this Agreement and/or the Guaranty, including without limitation: (1) any court action, administrative proceeding, arbitration or mediation or other collection activities, taken against Merchant or any Other Business, Successor Company or Guarantor; (2) any levy or foreclosure upon Collateral; or (3) any bankruptcy proceeding involving Merchant or any Guarantor, Other Business or Successor Company. Without limiting the foregoing, Merchant acknowledges that Costs of Collection will include Purchaser's reasonable in-house collection costs of not less than $2,500 for any Material Breach. The parties hereby agree that, following arms' length negotiations and opportunity to consult with counsel, the Contract Damages amount is fair and reasonable and does not constitute a penalty. In the event of any collection efforts or action for the collection of the Amount Sold and other amounts to be received by Purchaser under this Agreement, Purchaser shall be entitled to recoup its reasonable legal fees, court costs and related expenses from Merchant and any Other Business, Successor Company and/or Guarantor.

**9. Sale of Future Receivables. (a)** *Security Interest.* As provided above, the parties agree that the purchase and sale of Future Receiv- ables evidences is not, intended to be, and will not be construed as, a loan from Purchaser to Merchant. Merchant and Guarantor hereby grant to Purchaser, in the name of Purchaser or its duly authorized representative, a first priority, continuing security interest, (unless a third-party lien has been consented to by Purchaser in writing prior to the effective date) in and to: (i) the Amount Sold of Future Receivables of Merchant (and any subsidiary or other person or entity whose accounts are included in Future Receivables) purchased pursuant to this Agreement; (ii) all property used in Merchant's business (including the business assets of any subsidiary or other person or entity whose accounts are included in Future Receivables), including all accounts, chattel paper, deposit accounts, documents, fixtures, general intangibles, instruments, equipment and inventory as those terms are defined in Article 9 of the UCC, as amended, whether now or hereafter owned or acquired by Merchant (and/or any subsidiary or other person or entity whose accounts are included in Future Receivables) and wherever located; (iii) all proceeds of such property described in clause (i) and/or (ii), as that term is defined in Article 9 of the UCC; (iv) all business assets of Gaurantor; (v) upon a Material Breach, the assets, business property and collateral of any Other Business, Successor Company or Guarantor; and (vi) any additional collateral as may be mutually agreed between Merchant and/or any Guarantor , on the one hand, and Purchaser, on the other hand in writing (collectively, the **"Collateral"**).

Merchant and Guarantor acknowledge that any electronic signature provided for this Agreement (including the E-Signature) shall be deemed fully "authenticated" under Article 9 of the UCC for purposes of creating and perfecting the foregoing security interest. Upon Merchant's and Guarantor's express authorization and consent provided in this Agreement, Purchaser shall have the right to cause any UCC filing and/or recording relating to this Agreement (including filing a UCC-1 financing statement) at any time with any governmental agency and/or office (including the office of the Secretary of State), including, without limitation, to perfect Purchaser's rights and interests in the Collateral as provided in this Agreement. In addition, upon a Material Breach, Purchaser may exercise any rights and remedies available under the UCC and applicable law against Merchant and/or Guarantor, and including without limitation freezing Merchant's credit card processing accounts, the costs of which shall be borne by Merchant, as provided above. Merchant and Guarantor hereby acknowledge and consent that Merchant will not pledge, grant, transfer or otherwise encumber any security interest in its Future Receivables to any other person or entity until Purchaser has received the Amount Sold, plus any assessed fees and Costs of Collection, other than in connection with a financing approved by Purchaser in writing beforehand, in full.

**(b)** *Further Assurances.* You agree to execute any documents or take any action on behalf of Merchant and/or Guarantor in connection with this Agreement as Purchaser deems necessary to perfect or maintain Purchaser's security interest in the Collateral as provided in this Agreement.

**10. CERTAIN WAIVERS.** Merchant hereby irrevocably and unconditionally waives: (i) promptness, diligence, notice of acceptance, notice of presentment, demand, protest dishonor or default, and any other notice with respect to the Collateral; (ii) any claim that Purchaser exhaust any right, by statute or otherwise, or take any action against the Merchant or any other person or entity or the Collateral; (iii) any defense relating to the marshalling of assets or similar doctrine; (iv) all defenses of any kind, both substantive and procedural, to enforcement it may have, including any defenses relating to the proper service of any pleadings or other court documents; and (v) the right to assert any set-offs or counterclaims, whether legal, equitable or otherwise, against Purchaser or its affiliates. **BY SIGNING THIS GUARANTY, MERCHANT ACKNOWLEDGES THAT SUCH MERCHANT HAS PERMANENTLY WAIVED THE RIGHTS (1) TO START OR JOIN A CLASS ACTION; (2) TO TRIAL BY JURY; AND (3) TO RAISE DEFENSES AND COUNTERCLAIMS, TO THE MAXIMUM EXTENT PERMITTED BY LAW. UPON A MATERIAL BREACH OF THIS AGREEMENT BY MERCHANT, AN ACTION MAY BE FILED AGAINST EACH MERCHANT WITHOUT PRIOR NOTICE FOR PURCHASER'S CONTRACT DAMAGES AND COSTS OF COLLECTION .**

**11. Merchant Authorizations. (a)** *Credit Reporting Agencies.* You authorize Purchaser, from time to time, to contact any credit reporting or database service, Merchant's current, prior or third party card processors, and Merchant's current and prior banks (including without limitation the bank where any  Approved Account will be maintained) so that Purchaser may obtain whatever information Purchaser deems relevant, including without limitation Merchant's credit history, credit card, debit card and other payment card, processing and chargeback history.

**(b)** *Credit Reports and Information.* You authorize Purchaser to, from time to time, obtain credit reports or background reports on Merchant and its principals. Any such report(s) that Purchaser obtains may include, without limitation, a hard or soft credit pull, the business' or individuals' credit history or similar characteristics, employment and education verifications, social security verification, criminal and civil history, Department of Motor Vehicle records, any other public records, and any other information bearing on credit standing, credit capacity or character. Such reports will be used by Purchaser to determine (i) if it will proceed with the purchase of the Future Receivables from Merchant and (ii) after funding, if needed to assist Purchaser in the collection of Future Receivables. Merchant shall also provide and/or execute such further and additional documents, instruments, and writings as Purchaser may require in order to access and review any tax information (including tax returns) related to Merchant's business (including without limitation by executing a 4506T form with the Internal Revenue Service).

**(c)** *Recorded Calls; Contact.* You authorize Purchaser to monitor and/or record its telephone calls with Merchant and its principals, owners, employees or agents to confirm the contents of conversations, for evaluation by supervisors, training, monitoring for compliance, and for collections. You further agree that (i) you have established a business relationship with Purchaser, Purchasers employees and agents; (ii) you may be contacted from time-to-time regarding this Agreement or other business transactions; (iii) such communications and contacts are not unsolicited or inconvenient; and (iv)  contact may be made during normal business hours by phone, email or otherwise, using contact information provided by You, or Your agents or employees.

**(d)** *Power of Attorney.*  Until Purchaser has received the Amount Sold, plus any assessed fees and Costs of Collection, you hereby irrevocably, unconditionally, and jointly and severally appoint Purchaser as Merchant's agent coupled with an interest and attorney-in-fact, effective upon the occurrence and for the duration of any Material Breach, with full authority to enforce, execute or take any other action pursuant to any instrument or document, including without limitation any UCC filing, in the name of Merchant or other person or entity whose accounts are included in the definition of Future Receivables in **Section 2(c)**, and also for purposes of **Section 9(a)**. As your attorney-in-fact, upon such Material Breach, Purchaser shall, as permitted by law, have the right to: (i)  sign (including via E-Signature) any instruction letter or agreement on behalf of Merchant with Merchant's credit card processor(s) and/or any bank where Merchant maintains an Approved Account or any Other Business or Successor Company maintains  an Approved Account, instructing such processor to freeze all account proceeds and remit such proceeds to Purchaser; (ii) authorize the levy or foreclosure on Approved Accounts and use the local sheriff and/or marshal to seize Collateral in any Approved Account or at the business location of Merchant or any Other Business or Successor Company, as applicable; (iii) file any claims, actions or judgments or take any action or institute any proceeding, including without limitation any action against any Other Business, Successor Company, the principals thereof or any Guarantor, which Purchaser may deem necessary for the collection of any  Contract Damages and Costs of Collection); (iv) direct  customers  or account debtors to make payment directly to Purchaser; (v) collect Contract Damages and Costs of Collection from any Collateral; (vi) endorse checks, notes or other documents, including any documentation requested by Purchaser in furtherance of the power of attorney described herein) and/or (vii) obtain and adjust insurance.

10

·   (e) *Rights of Purchaser*. Without any prior notice to you and without affecting or reducing the liability of Merchant or any Guarantor hereunder, upon a Material Breach, Purchaser may: (1) compromise or settle any claim, liability or obligation of Merchant under this Agreement; (2) grant other concessions or indulgences to Merchant in respect thereof; (3) release, surrender, dispose of (including through foreclosure, and whether or not by judicial proceedings), exchange, modify, impair, fail to perfect, or extend the period of duration or time for the performance or discharge of any or all Collateral, including without limitation the Collateral of any Other Business or any Successor Company; and (4) take any action authorized in <u>Section 11(d)</u>. **In addition, upon a Material Breach, Purchaser has the right to enforce any remedy set forth in this Agreement, separately or together at Purchaser's discretion.** The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

(f) *Acknowledgments and Waiver*. Your signature on the signature page hereof on behalf of Merchant, will confirm that you have read and understand all terms and conditions of this Agreement. Merchant hereby irrevocably and unconditionally waives: (i) promptness, diligence, notice of acceptance, notice of presentment, demand, protest dishonor or default, and any other notice with respect to any obligations of Merchant with respect to the Collateral; (ii) any requirement that Purchaser exhaust any right, by statute or otherwise, or take any action against Merchant or any other person or entity or any Collateral; (iii) any defense relating to the marshalling of assets or similar doctrine; (iv) all defenses of any kind, both substantive and procedural, to enforcement it may have (now or in the future) and (v) the right to assert any set-offs or counterclaims, whether legal, equitable or otherwise.

**12. Limitation of Liability.** YOU HEREBY AGREE THAT, REGARDLESS OF THE CLAIMS YOU MAY HAVE AGAINST PURCHASER TO THE EXTENT PERMITTED BY LAW, YOUR SOLE REMEDY WILL BE MONEY DAMAGES NOT TO EXCEED THE GREATER OF (i) THE AMOUNT OF FUNDS OVERPAID TO PURCHASER, IF ANY, AND (ii) **FIVE THOUSAND DOLLARS ($5,000)**, AND THAT YOU WILL NOT BE ENTITLED TO, YOU HEREBY WAIVE, ANY AND ALL CLAIMS FOR, PUNITIVE, EXEMPLARY, CONSEQUENTIAL, LOST PROFITS, STATUTORY, OR SPECIAL DAMAGES OF ANY KIND, EVEN IF MERCHANT HAS BEEN ADVISED OF THE POSSIBLLITY OF SUCH DAMAGES. IF MERCHANT FILES ANY CLAIM OR ACTION AGAINST PURCHASER (X) IN DEROGATION OF THIS <u>SECTION 12</u> OR (Y) THE MATTER IS DISMISSED OR (Z) PURCHASER PREVAILS IN THE MATTER, YOU AGREE TO PAY ALL OF PURCHASER'S COSTS OF COLLECTION INCURRED IN THE MATTER.

**13. Indemnity.**  Merchant hereby, jointly and severally with each Guarantor, agrees to indemnify, defend and hold Purchaser harmless from and against any and all direct and third party suits, costs, causes of action, judgments, complaints, orders, and claims (each a "**Claim**"), together with any and all liabilities, losses, obligations, damages and penalties of any kind incurred by Purchaser or its affiliates, including without limitation Contract Damages, reasonable attorneys' fees and disbursements and all Costs of Collection, arising from or relating to any Claim that Merchant has breached this Agreement or that any representation, warranty, covenant, disclosure or statement Merchant has made is not accurate in any respect or for any intentional or willful misconduct of Merchant, including in connection with the preservation, protection, or enforcement of any rights of Purchaser under this Agreement, and in any case commenced by or against Merchant or any Guarantor under the United States Bankruptcy Code (Title 11, United States Code) or any similar or successor statute. Purchaser will notify Merchant of any claim for indemnity hereunder, select counsel of Purchaser's choice and Merchant will promptly pay all legal fees, defense costs and other expenses incurred by Purchaser and promptly pay to Purchaser any judgment or other Claim amounts due and payable, including without limitation all Contract Damages and Costs of Collection.

**14. Access and Retrieval of Information. (a)** *Authorization*. From and after the Effective Date, until the Amount Sold has been remitted to Purchaser, you authorize Purchaser to (i) access and collect any information relating Merchant's business (including information relating to Merchant's principals) maintained online by third-party financial institutions with which Merchant has relationships, maintains accounts or engages in financial transactions, (ii) access third party sites designated by Merchant, on Merchant's behalf, to retrieve information requested by Merchant, and to register for accounts requested by Merchant and (iii) access third party internet sites, servers or documents, retrieve information, and use Merchant's information for the purposes described herein. Purchaser may work with one or more online financial service providers under contract to access this account information and review bank statements, as determined by Purchaser at its sole discretion without notice to you (collectively, "**Service Provider**"). **You will immediately provide Purchaser and/or Service Provider with relevant account information, passwords and/or codes in order to ensure that Purchaser has full read-only access to your Approved Accounts.** Purchaser's current Service Providers is Yodlee (www.Yodlee.com), but Purchaser has the right in its sole discretion to change the Service Provider at any time without prior notice. Merchant acknowledges that Service Provider is an independent contractor not affiliated with Purchaser, that Purchaser is not responsible for any actions of a Service Provider, and that you agree not to seek damages or other compensation from Purchaser based on any action or inaction by a Service Provider.

(b) *Disclaimer of Warranty*.  YOU EXPRESSLY UNDERSTAND AND AGREE THAT MERCHANT'S USE OF THE SERVICE PROVIDER'S SERVICE (THE "SERVICE") AND ALL INFORMATION, PRODUCTS AND OTHER CONTENT (INCLUDING THAT OF THIRD PARTIES) INCLUDED IN OR ACCESSIBLE OR DOWNLOADED FROM THE SERVICE IS AT MERCHANT'S SOLE RISK. THE SERVICE IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS. PURCHASER AND SERVICE PROVIDER EXPRESSLY DISCLAIM ALL WARRANTIES OF ANY

11

KIND AS TO THE SERVICE AND ALL INFORMATION, PRODUCTS AND OTHER CONTENT (INCLUDING THAT OF THIRD PARTIES) INCLUDED IN OR ACCESSIBLE FROM THE SERVICE, WHETHER EXPRESS OR IMPLIED. MERCHANT AGREES THAT NEITHER PURCHASER OR SERVICE PROVIDER NOR ANY OF THEIR AFFILIATES WILL BE LIABLE FOR ANY HARM DAMAGES OF ANY KIND, EVEN IF THE PROVIDER HAS BEEN ADVISED PREVIOUSLY OF THE POSSIBILITY OF SUCH DAMAGES.

(c) *Service Content.* Merchant is permitted to use content delivered to Merchant through the Service only on the Service. Merchant may not copy, reproduce, distribute, or create derivative works from this content. Further, you agree not to reverse engineer or reverse compile any of the Service technology, including but not limited to, any Java applets associated with the Service. Merchant is licensing to Purchaser and its service providers, including Service Provider, any information, data, passwords, materials or other content (collectively, **"Content"**) Merchant provides through or to the Service. Purchaser and Service Provider may use, modify, display, distribute and create new material using such Content to provide the Service to Merchant.

**15.  Governing Law; Venue; Personal Jurisdiction; Consent to Service; Waiver of Jury Trial and Class Action; Statute of Limitations; Arbitration. (a)** *Governing Law.* This Agreement and all transactions hereunder, including without limitation the purchase and sale of Future Receivables as specified herein, will be governed by and enforced exclusively in accordance with the internal laws of the **State of New York,** without regard to conflict of laws principles. You expressly acknowledge that: (i) Purchaser maintains its principal office in the State of New York; (ii) the Funding Call and customer service will take place  with Purchaser's representatives in the State of New York; (iii) all funding to and payments from Merchant under this Agreement will be processed through Purchaser's Bank branches in New York; and (iv) the purchase and sale of Future Receivables pursuant to this Agreement shall take place in New York. **Accordingly, the parties agree that this Agreement and its subject matter bears a "significant, material and reasonable relationship" with the State of New York.**

(b) *Venue and Personal Jurisdiction.* Subject to Section 15(g), the parties irrevocably consent to the exclusive jurisdiction and venue of state courts located in: (x) the State of New York; (y) the State of Merchant's incorporation or formation or where its operations, offices, assets or domicile are located or (z) the state where any Guarantor resides. **Merchant and each Guarantor hereby irrevocably and unconditionally waives any and all claims and objections to jurisdiction and/or venue as per this provision.**

(c) *Consent to Service.* Merchant and each Guarantor waive personal service of any and all process upon Merchant and Guarantor and consent that service of process may be made by certified or registered mail. **Merchant and each Guarantor hereby irrevocably and unconditionally waives any and all claims and objections to service of process as per this provision.**

(d) *Waiver of Jury Trial and Class Action.* **EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT THAT THEY MAY HAVE TO (1) TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTION (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY); AND (2) ASSERT ANY CLAIMS AGAINST ANY OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN  ANY CLASS OR REPRESENTATIVE ACTION;(INCLUDING CLASS ARBITRATION), EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY PUBLIC POLICY. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST ANY OTHER PARTY, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY WILL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION; AND (3) THE FOREGOING WAIVERS ARE ESSENTIAL TERMS OF THIS AGREEMENT. YOU UNDERSTAND AND AGREE THAT, BY SIGNING THIS AGREEMENT, (1) YOU ARE PERMANENTLY WAIVING YOUR RIGHT TO A JURY TRIAL AND (2) YOU MUST BRING CLAIMS, INCLUDING IN COURT, ARBITRATION OR ANY OTHER LEGAL PROCEEDING, AGAINST PURCHASER ONLY IN YOUR INDIVIDUAL OR CORPORATE CAPACITY,  AS APPLICABLE, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.**

(e) *Waiver of Consumer Defenses.*  Merchant and each Guarantor hereby waive any defense, regardless of the actual use of the Funded Amount by Merchant or Guarantor, claiming that the Funded Amount was made to Merchant or Guarantor for personal, consumer, family or household purposes.  Merchant and each Guarantor understand and agree that, as set forth in Section 1 above, the amount funded is solely for business purposes and for the operation of your business as set forth in this Agreement.

(f) *Reduced Statute of Limitations.* Each party hereto agrees, after consultation with counsel, that: (i) it will not bring any claim, action or legal or administrative proceeding of any kind or under any legal or equitable theory or request for relief of any kind to enforce or arising out of or relating to in any material respect this Agreement (collectively, **"Action or Proceeding"**) after the date **one (1) year** from the sooner to occur of (x) the receipt of the Amount Sold in full by Merchant to Purchaser and (y) the effective date of termination for any reason of this Agreement (such period, the **"Limitations Period"**); (ii) all statutes of limitations under

applicable law shall in all cases be limited to the Limitations Period; and (iii) the Limitations Period is a reasonable period of time in which to bring an Action or Proceeding under or relating to this Agreement.

(g) *Arbitration.* Notwithstanding any provision hereof, and excluding any action by Purchaser for injunctive relief under this Agreement, each party agrees to confidential arbitration of all disputes and claims arising out of or relating to this Agreement, including issues relating to the arbitrability of any dispute or claim (collectively, "claims") at the request of the other party. If a party seeks to have a dispute settled by arbitration, that party must first send to the other party, by certified mail, a written Notice of Intent to Arbitrate (the "**Notice**"). If the parties do not reach an agreement to resolve the claim within thirty (30) days after the Notice is received, Purchaser and Merchant agree that the claim will be resolved by a final and binding arbitration proceeding with JAMS, Inc. ("**JAMS**") in New York County, State of New York, under the Optional Expedited Arbitration Procedures then in effect. The parties agree that, except as otherwise expressly required by JAMS rules, (i) the party filing arbitration shall pay all JAMS filing fees and reasonable administrative fees; (ii) thereafter, each party shall bear its own arbitration costs and fees, including witness fees and attorneys' fees; and (iii) each party shall bear an equal share of the arbitrator's fees; provided, if the arbitrator finds that either the substance of the claims of any party or the relief sought by any party is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), then the arbitrator shall award the other party all of its costs and fees of the arbitration, including witness and reasonable attorneys' fees. Purchaser and Merchant agree that, except as expressly otherwise provided herein, (i) arbitration is the required and exclusive forum for the resolution of all claims and (ii) to the fullest extent permitted by law, Purchaser and Merchant are each permanently giving up their right to a jury trial in any forum and the right to a judicial forum for the resolution of any and all claims. Further, the parties agree that the arbitrator may not consolidate proceedings for more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding, and that if this specific provision is found unenforceable, then the entirety of this arbitration clause shall be null and void.

**MERCHANT MAY OPT OUT OF ARBITRATION. In order to opt out of this Arbitration Clause, Merchant shall send Purchaser a written notice executed by Merchant, stating that Merchant does not want the arbitration clause set forth in this Section 15(g) to apply to the Agreement. For any opt out to be effective, an opt out notice, duly executed by Merchant, must be sent to the following address by registered mail, within ten (10) business days after the Effective Date (*i.e.*, the date this Agreement is funded, time being of the essence, to: Itria Ventures LLC, One Penn Plaza, Suite 4530, New York, NY 10119, Attention: President and General Counsel.**

16. **Miscellaneous. (a)** *Entire Agreement.* This Agreement, including the Guaranty, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all previous agreements and understandings, whether written or oral. This Agreement may only be modified by written amendment signed (including E-Signature) by the parties, and shall inure to the benefit of the parties and their respective successors and permitted assigns. Upon the termination of this Agreement for any reason, Sections 6, 7, 8, 9, 10, 11(d), 12, 13, 14(b), 15 and this Section 16 shall remain in full force and effect.

(b) *Assignment and Delegation.* You may not assign this Agreement or any rights herein or delegate any duties, in whole or in part, without the prior written consent of Purchaser, and any purported assignment or delegation by Merchant without such consent shall be void *ab initio.* Purchaser may assign, sell and transfer this Agreement or any rights herein, to any party, without the consent of or notice to Merchant.

(c) *Notices.* All communications between the parties with respect of, or notices, requests, directions, consents or other information sent under, this Agreement shall be in writing and delivered by email (with proof of transmission) to an email address of the other party at which such party normally and customarily receives email communications as of the time the notice is sent or, at the request of any party, by Federal Express or other internationally recognized courier (with signature). All such communications and notices shall be effective upon receipt or sending with proof of transmission.

(d) *Service of Process.* Merchant agrees and hereby consents that service of process for any lawsuit or arbitration involving Merchant or any of its principals may be made by Purchaser at Merchant's primary business address.

(e) *No Waiver.* There will be effected no waiver by failure on the part of Purchaser to exercise, or delay in exercising, any right under this Agreement, nor will any single or partial exercise by Purchaser of any right under this Agreement preclude any other future exercise of any right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

(f) *Severability.* The illegality, invalidity or unenforceability of any provision of this Agreement under the law of any jurisdiction shall not affect its legality, validity or enforceability under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision.

13

(g) *Further Assurances*. The parties agree to execute such further and additional documents, instruments, and writings as may be necessary, proper, required, desirable, or convenient for the purpose of fully effectuating the terms and provisions of this Agreement.

(h) *Counterparts; Telecopies*. This Agreement may be signed in multiple counterparts, all of which taken together shall be deemed to constitute one and the same original instrument.  Transmission by email, telecopier, facsimile or other form of electronic transmission of a signed counterpart of this Agreement shall be deemed a signed original.

(i) *Consent to Electronic Transactions*. You expressly consent to conducting this transaction by electronic means, including without limitation email communications, electronic signatures, the creation of a duly authenticated security interest by electronic signature, and the retention and storage of electronic records, to the maximum extent permitted by law. Merchant agrees that Purchaser does not need to provide Merchant with a paper copy of any notice or document relating to this Agreement unless specifically requested by Merchant in writing.

(j) *Electronic Signatures*.  The E-Signature(s) to this Agreement (and any other electronic symbol or process expressly approved and authorized by Purchaser) or to any addendum, amendment or other agreement or document related to this Agreement, shall have the same legal validity and enforceability as a manually executed signature or use of a  paper-based recordkeeping system to the fullest extent permitted by applicable law, including without limitation the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any similar state law based on the Uniform Electronic Transactions Act, and Merchant and Guarantor hereby waive any objection to the contrary.

**[END OF AGREEMENT]**

14

## GUARANTY OF PERFORMANCE

(a) *Guaranty of Performance.* By signing this Guaranty of Performance (this **"Guaranty"**) in accordance with this Agreement on the signature page hereof as "Guarantor," each Guarantor hereby assumes and, jointly and severally, guarantees Merchant's full, complete and timely performance of all of Merchant's obligations under this Agreement. Purchaser may from time to time proceed to enforce its rights against each Guarantor, prior to, contemporaneously with or after any enforcement against Merchant or without any enforcement against Merchant, or enforcing its rights in any Collateral that Purchaser may hold pursuant to the Agreement. The obligations of Guarantors are unconditional and absolute, and shall remain in effect and enforceable by Purchaser until the entire Amount Sold has been received by Purchaser, including (i) any assessed fees and Costs of Collection, whether or not litigation is commenced and (ii) the return of any amount of remittances set aside or returned by Purchaser for any reason. If there is more than one Guarantor, the liability of all such guarantors shall be joint and several. The Guarantor's signature on the Guaranty signature page hereof as a "Guarantor" will conclusively evidence that the Guarantor has read and understands all terms and conditions of this Agreement.

(b) *Affirmations.* Without limiting the foregoing, each Guarantor hereby reaffirms all representations and warranties, covenants and acknowledgements of Merchant in this Agreement, including without limitation: (i) the fundamental terms, conditions and waivers in <u>Section 1</u>, including that this Agreement evidences the purchase and sale of Future Receivables and does not constitute a loan; (ii) the representations, warranties and agreements of Merchant in <u>Section 6</u>; (iii) the authorizations for Purchaser to contact credit reporting agencies, access credit reports and information and effect credit pulls with respect to Guarantor, as per <u>Section 11(a)</u> and <u>(b)</u>; (iv) the power-of attorney designation and other rights of Purchaser set forth in <u>Section 11(d)</u>; (v) the limitation of Purchaser's liability in <u>Section 12</u>; (vi) the legal provisions and waivers in <u>Section 15</u> (Governing Law; Venue; Personal Jurisdiction; Consent of Service; Waiver of Jury Trial and Class Action; Statute of Limitations; Arbitration); (vii) Purchaser's remedies upon Material Breach by Merchant with respect to Approved Accounts, as set forth in <u>Sections 8</u> and <u>11(d)</u>; and (viii) the waivers set forth in <u>subparagraph (c)</u> below. Further, each Guarantor represents and warrants that he or she is a legal resident of the United States of America. Guarantor also consents to service of any pleadings or other court documents by electronic mail at the Merchant's email address provided by Merchant.

(c) *Waivers.* Each Guarantor hereby irrevocably and unconditionally waives: (i) promptness, diligence, notice of acceptance, notice of presentment, demand, protest dishonor or default, and any other notice with respect to the Collateral; (ii) any claim that Purchaser exhaust any right, by statute or otherwise, or take any action against the Merchant or any other person or entity or the Collateral; (iii) any defense relating to the marshalling of assets or similar doctrine; (iv) all defenses of any kind, both substantive and procedural, to enforcement it may have, including any defenses relating to the proper service of any pleadings or other court documents; and (v) the right to assert any set-offs or counterclaims, whether legal, equitable or otherwise, against Purchaser or its affiliates.  **BY SIGNING THIS GUARANTY, EACH GUARANTOR ACKNOWLEDGES THAT SUCH GUARANTOR HAS PERMANENTLY WAIVED THE RIGHTS (1) TO START OR JOIN A CLASS ACTION; (2) TO TRIAL BY JURY; (3) TO RAISE DEFENSES AND COUNTERCLAIMS, TO THE MAXIMUM EXTENT PERMITTED BY LAW; AND (4) TO CONTEST THE ENTRY OF A LEGAL JUDGMENT AGAINST GUARANTOR. UPON A MATERIAL BREACH OF THIS AGREEMENT BY MERCHANT, MAY BE FILED AGAINST EACH GUARANTOR WITHOUT PRIOR NOTICE FOR PURCHASER'S CONTRACT DAMAGES AND COSTS OF COLLECTION.**

(d) *Rights of Purchaser.* Without notice to or from any Guarantor and without affecting or impairing the liability of Guarantor hereunder, Purchaser may: (1) compromise or settle any claim, liability or obligation of Merchant under this Agreement; (2) grant other concessions or indulgences to Merchant in respect thereof; (3) amend or modify the Agreement in any manner with Merchant as provided therein; and (4) release, surrender, dispose of (including through foreclosure, and whether or not by judicial proceedings), exchange, modify, impair, fail to perfect, or extend the period of duration or time for the performance or discharge of any or all Collateral. Each Guarantor acknowledges that, upon a Material Breach of the Agreement by Merchant, Purchaser may without prior notice to Guarantor bring an action against each Guarantor as provided in <u>Section 10</u>, and thereafter domesticate such judgment in another jurisdiction at Purchaser's discretion, whether prior to, contemporaneously with or after any enforcement against Merchant or without any enforcement against Merchant. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

(e) *Enforcement Expenses.* After a Material Breach, each Guarantor agrees to pay or reimburse Purchaser for all costs, expenses and attorneys' fees and disbursements paid or incurred by Purchaser in endeavoring to collect and enforce the Agreement and/or this Guaranty, including in connection with the preservation, protection, or enforcement of any rights of Purchaser in any case commenced by or against Guarantor under the United States Bankruptcy Code (Title 11, United States Code) or any similar or successor statute.

**[END OF GUARANTY]**
**[SIGNATURE PAGE FOLLOW]**

15

IN WITNESS WHEREOF, (i) Merchant and Purchaser by their duly authorized officers have executed this Future Receivables Sale Agreement and (ii) each Guarantor has executed the **Guaranty of Performance**, in each case on the date specified by the Notary below. By signing this Agreement, Merchant and each Guarantor hereby affirm to Purchaser that they have read and understand this Agreement, including without limitation the provisions referenced in Section 1 (Fundamental Terms, Conditions and Waivers). By signing the Guaranty, each Guarantor further affirms to Purchaser that such Guarantor has read and understands the Guaranty, including without limitation the affirmations and waivers specified therein.

MERCHANT: **MARQUIS CATTLE COMPANY**

MERCHANT

TAX ID #: _____454030573_____

By: X  *Cory Shannon Marquis*

Name: CORY SHANNON MARQUIS

Title: _____Owner_____

By: X  **BECKIE JO MARQUIS**

Name: _____BECKIE JO MARQUIS_____

Title: _____Partner_____

By: X _____

Name: _____

Title: _____

By: X _____

Name: _____

Title: _____

PURCHASER

**ITRIA VENTURES LLC**

By: X _____

Name: _____

Title: _____

GUARANTOR

X  *Cory Shannon Marquis*

Name: CORY SHANNON MARQUIS

SS#: XXX-XX-9669

GUARANTOR

X _____

Name: _____

SS#: _____

X  **BECKIE JO MARQUIS**

Name: _____BECKIE JO MARQUIS_____

SS#: XXX-XX-4031

X _____

Name: _____

SS#: _____

STATE OF __Virginia__ )
COUNTY OF Chesapeake )

I, _____Brenda Turner_____. a Notary Public, do hereby certify that on this 22nd day of __December__, 2021, appeared before me _____CORY SHANNON MARQUIS & BECKIE JO MARQUIS_____,

the _____Owner/Partner_____ of Merchant, and a Guarantor under the within Future Receivables Sale Agreement, each personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the foregoing agreement, and swore and acknowledged to me that he or she executed the same by and in the name of Merchant and/or as Guarantor, respectively, for the purpose and in the capacity therein expressed, and that the statements contained therein are true and correct.

Notary Signature: _Brenda Turner_
Name of Notary: _____Brenda Turner_____
Notary Commission Expires: ____10/31/2025____

Brenda Turner
REGISTRATION NUMBER
7620382
COMMISSION EXPIRES
October 31, 2025

Notarized online using audio-video communication

## ADDENDUM TO THE FUTURE RECEIVABLES SALE AGREEMENT

This Addendum to the Future Receivables Sale Agreement (this "**Addendum**") shall be an integral part of the Future Receivables Sale Agreement, dated as of December 21, 2021, (the "**Agreement**") by and between _____ MARQUIS CATTLE COMPANY _____ ("**Merchant**") on one hand, and Itria Ventures LLC ("**Purchaser**") on the other, and the performance of which is guaranteed by Merchant's undersigned principal(s) ("**Guarantor**"). All capitalized terms contained herein shall have the same meaning ascribed to them in the Agreement unless the context clearly requires otherwise.

NOW THEREFORE, it is agreed as follows:

1.    "Amount Sold" in the Purchase and Sale Terms of the Agreement shall be appended to include the following:

> The Amount Sold shall be _____ Six Hundred Eighty Four Thousand Dollars _____ ($ 684,000.00 ) if such amount is received by Purchaser not later than January 21, 2022.

> The Amount Sold shall be _____ Six Hundred Ninety Six Thousand Dollars _____ ($ 696,000.00 ) if such amount is received by Purchaser not later than February 21, 2022.

> The Amount Sold shall be _____ Seven Hundred Eight Thousand Dollars _____ ($ 708,000.00 ) if such amount is received by Purchaser not later than March 21, 2022.

2.    This Addendum shall be incorporated in the Agreement and shall be binding upon the undersigned and their respective successors and assigns. To the extent that there is an inconsistency between the provisions of this Addendum and the provisions of the Agreement, the provisions of this Addendum shall govern.

**[Signature page to follow]**

IN WITNESS WHEREOF, the parties below have executed this Addendum as of the date of the Agreement.

**PURCHASER**

**ITRIA VENTURES LLC**

By: _____

Name: _____

Title: _____

**MERCHANT**

By: _Cory Shannon Marquis_

Name: CORY SHANNON MARQUIS

Title: Owner

**MERCHANT**

By: _BECKIE JO MARQUIS_

Name: BECKIE JO MARQUIS

Title: Partner

**GUARANTOR**

By: _Cory Shannon Marquis_

Name: CORY SHANNON MARQUIS

**GUARANTOR**

By: _BECKIE JO MARQUIS_

Name: BECKIE JO MARQUIS

**MERCHANT**

By: _____

Name: _____

Title: _____

**MERCHANT**

By: _____

Name: _____

Title: _____

**GUARANTOR**

By: _____

Name: _____

**GUARANTOR**

By: _____

Name: _____

STATE OF __Virginia__ )
                                        ) ss:
COUNTY OF __Chesapeake__ )

I, __Brenda Turner__ a Notary Public, do hereby certify that on this 2nd day of __December__ 20_21_, appeared before me, CORY SHANNON MARQUIS & BECKIE JO MARQUIS _____, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the foregoing Addendum, and swore and acknowledged to me that (s)he executed the same by and in the name of principal of Merchant for the purpose and in the capacity therein expressed, and in his/her individual capacity as Guarantor, and that the statements contained therein are true and correct.

Notary Signature: __Brenda Turner__
Name of Notary: __Brenda Turner__
Notary Commission Expires: __10/31/2025__

Brenda Turner
REGISTRATION NUMBER
7920382
COMMISSION EXPIRES
October 31, 2025

2

Notarized online using audio-video communication

# EXHIBIT "B"

# EXHIBIT "B"

# itriaventures™

# FUTURE RECEIVABLES SALE AGREEMENT

**Note: These Purchase and Sale Terms ("Purchase and Sale Terms") form a part of and are incorporated into this Future Receivables Sale Agreement ("Agreement"), which continues on the next page.**

**Case ID:** 1096621

**Purchaser:** Itria Ventures LLC, a Delaware limited liability company (**"Purchaser"**).

**Merchant(s):** MARQUIS CATTLE COMPANY

a Montana Corporation ("**Merchant**" or "**you**").

**Contract Date:** Mar 14, 2022.

**Purchase Price:** Three Hundred Fifty Thousand Dollars ($ 350,000.00 ).

The purchase price ("**Purchase Price**") is a gross amount before application of fees ("**Fees**"). The amount funded to you under this Agreement ("**Funded Amount**") will be net of the Fees specified below.

**Amount Sold:** Four Hundred Thirty Seven Thousand Five Hundred Dollars ($ 437,500.00 ).

This is the amount of your Future Receivables purchased by Purchaser under this Agreement ("**Amount Sold**"). Please refer to Sections 2(a) and 2(b).

**Purchased Percentage:** Three Point Seven Six percent ( 3.76 %). This is the percentage of your Future Receivables that Purchaser will receive until the Merchant has delivered the Amount Sold; (**"Purchased Percentage"**), on the periodic basis specified below.

**Periodic Amount:** Nine Thousand One Hundred Fourteen Dollars And Fifty Eight Cents ($ 9,114.58 ). This is the periodic amount to be remitted to Purchaser every every week (**"Periodic Amount"**), subject to monthly True-Up against your actual Purchase Percentage of Future Receivables, as provided in Section 5.

**Fees:** Your Fees under this Agreement total Eleven Thousand Dollars ($ 11,000.00 ). This amount will be deducted from your Purchase Price specified above, per Section 3(a). Additional fees may be payable after the Contract Date. Please refer to Section 3(b).

**Funded Amount:** Three Hundred Thirty Nine Thousand Dollars ($ 339,000.00 ).

This amount is the Purchase Price *less* Fees, and is the net amount funded to you under this Agreement.

*CSM*

**Guaranty of Performance**
*(see page 15)*

**Guarantor(s):** CORY SHANNON MARQUIS & BECKIE JO MARQUIS *BJM* ("**Guarantor**").

**ALL PARTIES AND GUARANTOR AGREE TO CONDUCT THIS TRANSACTION BY ELECTRONIC MEANS AS FURTHER SPECIFIED IN THE AGREEMENT**

This **FUTURE RECEIVABLES SALE AGREEMENT** ("**Agreement**"), dated as of the date specified on the prior page, is made by and between **Itria Ventures LLC**, a Delaware limited liability company ("**Purchaser**"), and the merchant(s) identified as "Merchant" in the Purchase and Sale Terms and on the signature page hereof (collectively, "**Merchant**" or "**you**").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties now intend to be legally bound and agree as follows:

**1. Fundamental Terms, Conditions and Waivers.** This is a contract for the purchase and sale of Future Receivables. Purchaser is buying a stated amount of the Merchant's Future Receivables (the Amount Sold) for the Purchase Price set forth on the front page of this Agreement. Purchaser's right to receive payments under this Agreement is contingent on your receipt of Future Receivables. To this end, you have the right to request a reconciliation ("**True-Up**") of Periodic Amount remittances made in any calendar month against your actual Future Receivables for that month using the Purchased Percentage method, provided you comply with the requirements set out in <u>Section 5</u>. The term "Future Receivables" is defined in <u>Section 2(c)</u>. **By signing this Agreement, you confirm to Purchaser that: (1) the representations, warranties and covenants set forth in <u>Section 6</u> are reasonable and necessary to effect the purposes of this Agreement and to afford Purchaser the benefit of its bargain pursuant to this Agreement; and (2) you will use the funded amount solely for business purposes and in the operation of your business; and that you will operate the Merchant business in good faith.**

By signing this Agreement, you confirm that the purchase and sale of Future Receivables contemplated by this Agreement does not constitute a loan transaction. Because the transactions under this Agreement are a sale and not a loan, there is no term, interest rate or any annual percentage rate (APR). In addition, because this transaction is not a loan, Purchaser has assumed the risk that Future Receivables may not be available for remittance to Merchant. Correspondingly, you acknowledge that Merchant's representations, warranties and covenants in this Agreement that are designed to give Purchaser a reasonable and fair opportunity to receive the benefit of its bargain.

You acknowledge that you have been advised by Purchaser to consult with legal counsel, and that you have been afforded a full opportunity to consult with legal counsel. You hereby affirm to Purchaser that you have either consulted with such counsel or voluntarily elected not to do so. **Without limiting the foregoing, you further acknowledge that Purchaser has advised you to consult with legal counsel with respect to the waivers set out directly below:**

<u>**CERTAIN WAIVERS**</u>. **BY SIGNING THIS AGREEMENT, YOU ALSO ACKNOWLEDGE THAT YOU HAVE PERMANENTLY WAIVED THE RIGHTS (1) TO START OR JOIN A CLASS ACTION IN ANY CAPACITY; (2) TO TRIAL BY JURY; AND (3) TO RAISE DEFENSES AND COUNTERCLAIMS, TO THE MAXIMUM EXTENT PERMITTED BY LAW.**

Purchaser will conduct a recorded call prior to funding (the "**Funding Call**"). On this call, Purchaser will go over the Agreement and certain key requirements, including that this Agreement must be duly signed by Merchant by utilizing the electronic signature service selected by Purchaser (the "**E-Signature**" or to "**E-sign**" or "**sign**"). In addition, each individual listed as a "Guarantor" on the front page of this Agreement (collectively, "**Guarantor**") must duly sign the Guaranty of Performance (the "**Guaranty**") on the signature page hereof. You hereby affirm that all information provided to Purchaser is truthful and accurate. This Agreement will not become effective unless and until the Agreement is funded by Purchaser (such date, the "**Effective Date**"). Purchaser's obligation to fund this Agreement is subject to due diligence review at Purchaser's sole discretion.

By signing this Agreement, you further acknowledge that the execution and performance of this Agreement by Merchant will not conflict with or breach any other agreement or obligation of Merchant including without limitation the breach of any loan or other financing agreement previously entered into by Merchant.

**2. Purchase and Sale of Future Receivables.** (a) *Title to Future Receivables*. In exchange for the Purchase Price, you hereby irrevocably, unconditionally and absolutely sell, assign and transfer to Purchaser all (100%) of Merchant's right, title and interest (whether legal, equitable or beneficial) in and to the Amount Sold out of Merchant's Future Receivables, on the terms and conditions specified herein. The purchase and sale of Future Receivables under this Agreement shall take place in New York. As of the Effective Date, the purchased Future Receivables shall be absolutely and unconditionally transferred to, owned by, controlled by, and vested

solely in Purchaser, subject to the terms and conditions hereof. This Agreement is a binding legal contract and shall become effective as of the Effective Date. You agree to deliver or cause to be delivered the Amount Sold from your Future Receivables to Purchaser, as described in this Agreement. Until Purchaser has received the Amount Sold in full (including the return of any remittances set aside or returned by Purchaser for any reason), you agree that:

- ■ **You will remit Future Receivables to Purchaser as specified in this Agreement.**
- ■ **You will not sell or transfer your Future Receivables, assets or business or take any action that would interfere with Purchaser's right to receive Future Receivables.**
- ■ **You will not enter into any loan, factoring, merchant cash advance or other financing agreement without Purchaser's prior written consent.**
- ■ **You will ensure that all information and documents provided to Purchaser are correct and accurate.**
- ■ **You will immediately update Purchaser on any material change in this information or your business' condition.**

(b) *Purchase and Sale Terms*. The Purchase and Sale Terms, set out on the front page of the Agreement initialed by Merchant, form a part of this Agreement and are further described herein. The **"Purchase Price"** is the gross dollar amount Purchaser is paying for Merchant's Future Receivables, (defined in subparagraph(c) below). The **"Amount Sold"** is the dollar value of the Future Receivables sold to Purchaser and that are to be remitted to Purchaser out of your Future Receivables, as provided herein. The **"Purchased Percentage"** is the percentage of Future Receivables that Purchaser will receive on the periodic basis specified on the front page of the Agreement, until the Amount Sold (plus any additional fees and charges incurred under this Agreement) has been fully delivered to Purchaser. The **"Periodic Amount"** is the amount the parties have agreed that, for administrative convenience, other than for credit card split deals (as evidenced by a separate writing (including email) between Merchant and Purchaser), you will remit to Purchaser on the periodic basis specified on the front page of the Agreement, subject to reconciliation (True-Up) against your actual Future Receivables on a monthly basis, as set forth in Section 5. The **"Funded Amount"** is the amount you will receive upon funding of this Agreement, and is equal to the Purchase Price, less total Fees, which are set forth on the front page of this Agreement and specified in Section 3(a).

(c) *Future Receivables*. **"Future Receivables"** means any and all: (i) funds that Merchant receives from its customers using credit cards, charge cards, debit cards, prepaid cards, benefit cards, or similar cards to purchase Merchant's products and/or services (including without limitation any such funds that are processed by Merchant's card processor(s)); (ii) funds that Merchant receives from the its customers of cash, checks, money orders or other electronic transfers or other forms of payment to purchase Merchant's products and/or services; (iii) accounts, future accounts, contract rights, choses in action and any other rights to payment; and (iv) insurance proceeds received by Merchant (up to the full Amount Sold less total remittances under this Agreement) in connection with any of the foregoing, in each case as applicable. "Future Receivables" also includes the Future Receivables of Merchant's subsidiaries and affiliated companies and, upon a Material Breach, of any (x) new or existing company owned or controlled by Merchant or any Guarantor (collectively, an **"Other Business"**), (y) any new or existing company, whether owned or controlled by Merchant or Guarantor or any third party, to which all or a material portion of the business or assets of Merchant are sold or otherwise transferred (collectively, a **"Successor Company"**) or (z) any affiliate of any of the foregoing, in each case without the express prior written consent of Purchaser.

(d) *Approved Accounts*. Please specify all of Merchant's business bank accounts below, and also designate the account Purchaser should use to fund the Agreement. If no account is so designated, Purchaser will fund into the first account listed below.

| Account #1*     * REQUIRED | Account #2 | Account #3 |
|---|---|---|
| Deposit Funds / Withdrawals | Deposit Funds / Withdrawals | Deposit Funds / Withdrawals |
| Bank Name: FIRST INTERSTATE BANK | Bank Name: INDEPENDENCE BANK | Bank Name: _____ |
| Routing #: 092901683 | Routing #: 092901340 | Routing #: _____ |
| Account #: 8500484806 | Account #: 2082986 | Account #: _____ |

| Account #4 | Account #5 | Account #6 |
|---|---|---|
| Deposit Funds / Withdrawals | Deposit Funds / Withdrawals | Deposit Funds / Withdrawals |
| Bank Name: _____ | Bank Name: _____ | Bank Name: _____ |
| Routing #: _____ | Routing #: _____ | Routing #: _____ |
| Account #: _____ | Account #: _____ | Account #: _____ |

You hereby authorize Purchaser to debit or ACH your Approved Accounts (as defined) on the periodic basis and in the amounts specified herein, without further notice to or approval by you. As used herein, "Approved Accounts" means all (i) the Merchant accounts listed above; (ii) other Merchant business accounts; (iii) on credit card split deals, Merchant's authorized credit card processors; and (iv) upon the occurrence of a Material Breach, all other business accounts or credit card processing accounts of Merchant or any Other Business, Successor Company or Guarantor. **You acknowledge that Purchaser shall have full read-only access to all Approved Accounts while this Agreement is in effect.**

**3. Fees Deducted at Funding; Additional Fees. (a)** *Fees Deducted from Purchase Price.* The Fees specified in this <u>Section 3(a)</u> will be deducted from Purchase Price in order to calculate the Funded Amount paid to you at closing. The Fees  so deducted from the Purchaser Price are: (1) a **"Platform Fee"** of _____Three Percent (3%)_____ % of the Purchase Price, which represents Purchaser's administrative  and online platform costs; (2) **an underwriting fee of $** _Five Hundred Dollars   ($500)_ , which represents Purchaser's underwriting and UCC filing costs; (3) if a lock box is required by Purchaser, a fee of $12.50 which represents Purchaser's cost to set up the lock box; and (4) any fees relating to the referral of Merchant to Purchaser for financing, and/or any remaining  undelivered Amount Sold by Merchant or any of Merchant's affiliates to Purchaser or any of Purchaser's affiliates under any Future Receivables Sale Agreement, and/or any amount owed in connection with any other financing between Purchaser (or affiliate) and Merchant (or affiliate). **The aggregate Fees deducted from the Purchase Price are specified on the front page of this Agreement as the Funded Amount, namely the net amount paid to Merchant upon funding of this Agreement. Please note that these Fees are not Future Receivables payments and hence will not reduce the Amount Sold.**

**(b)** *Additional Fees.* Merchant authorizes Purchaser to charge Merchant the following fees, without notice: (1) <u>Returned Item Fee</u>: a returned item fee of **twenty-five dollars ($25.00)** (or lower amount if expressly required by law) **per return** will be assessed if a check, draft, wire transfer, ACH or similar instrument issued by Merchant or an individual that signs this Agreement is not honored or cannot be processed, or an electronic debit is returned or cannot be processed (each, a **"Returned Item"**). Purchaser may assess this fee each time remittance of Future Receivables is returned or cannot be processed, even if it is later honored following resubmission. Any check, draft or similar instrument may be collected electronically if returned for insufficient or uncollected funds; (2) <u>Electronic Access Fee</u>: If Merchant fails to assist Purchaser in maintaining access to electronic bank information for the Approved Accounts, Merchant will be charged **five percent (5%)** of the remaining Amount Sold. Merchant acknowledges that these fees bear a reasonable relationship to the damages incurred by Purchaser and are reasonable in amount. (3) <u>Costs of Collection</u>, as specified in <u>Section 8.</u>(4) <u>Lock Box Monthly Fee (if required by Purchaser)</u>: a monthly fee of $30.00 to administer the lock box. **Please note that these fees are not Future Receivables payments and hence will not reduce the Amount Sold.**

**4. Remittance Methods.** Merchant shall remit the Applicable Amount (as defined) of Future Receivables to Purchaser in one of the following methods specified below. Merchant agrees to provide any and all authorizations, approvals, documents and assistance required to establish or change a remittance method if requested by Purchaser. You agree that Merchant will not change remittance methods or permit any event to occur that could cause a diversion of any of Merchant's Future Receivables from the specified remittance account to any other account or entity. **You will provide Purchaser and/or its authorized agents with all information, authorizations and passwords that are necessary for and/or Service Provider (as defined) to verify Merchant's receivables, receipts, and deposits.** All Future Receivables shall be remitted on the first business day of the applicable periodic period specified in the Purchase and Sale Terms, in the Applicable Amount. As used herein, the **"Applicable Amount"** means the Applicable Amount of Future Receivables to be periodically remitted to Purchaser as specified below, subject to the True-Up in <u>Section 5</u> for transactions using the ACH remittance method, as per clause (1) below.

(1) *ACH/Direct Debit*. Unless otherwise agreed with Merchant, Purchaser will withdraw the Periodic Amount by initiating a debit via the Automatic Clearing House ("ACH") system to your Approved Account. You hereby authorize Purchaser to debit the designated amount from your Approved Account(s) (as defined) on the periodic basis specified above, until the Amount Sold and any other fees and charges incurred under this Agreement have been received in full by Purchaser. You understand and acknowledge that, due to the timing of the receipt of data by Purchaser  and the operations and rules of the ACH system as determined by the National Automated Clearing House Association ("NACHA"), Purchaser will not be able to confirm receipt of Future Receivables until after the actual debit. **You agree to promptly provide any assistance requested by Purchaser and/or a financial institution to confirm to that you have authorized Purchaser to initiate debit via ACH to your Approved Account.**

(2) *Direct Split*. For direct split deals (or direct split components of deals), in which Future Receivables are remitted to Purchaser by your approved credit card processor, as separately agreed between you and Purchaser, the Purchased Percentage method shall Purchaser's exclusive method of remittance so long as a Material Breach has not occurred. You agree to use a credit card processor acceptable to Purchaser and to promptly enter into an agreement with the approved credit card processor, pursuant to which your credit card processor will remit the Purchased Percentage directly to Purchaser, rather than to you, until the Amount Sold and any other fees and charges incurred under this Agreement have been received by Purchaser in full.  Purchaser may require you to use a different credit card processor or change credit card processors at the Purchaser's sole discretion.  You agree to promptly enter into a new agreement with a credit card processor to effectuate this Agreement upon Purchaser's request.   You acknowledge and agree that

processor may provide Purchaser with Merchant's credit card, debit card and other payment card and instrument processing history, including without limitation Merchant's chargeback history and any communications about Merchant received by processor from a card processing system, as well as any other information Purchaser deems pertinent. You understand that Purchaser does not have any power or authority to control processor's actions with respect to the authorization, clearing, settlement and other processing of transactions and that Purchaser is not responsible for processor's actions If applicable, you also agree to forward to Purchaser, on a daily, weekly, bi-weekly or monthly (as applicable) basis to by Purchaser (or any third party designated by Purchaser), all electronic payment transaction records from Merchant's point of sale system relevant to Future Receivables transactions (including, but not limited to, activity on Visa, MasterCard, American Express, Discover, Diners Club, JCB, or ATM Debit Cards and check truncation records).

(3) *Lockbox*. You hereby authorize Purchaser, upon written notice to you, to debit the Applicable Amount from a deposit account to be established by Merchant at Purchaser's written request that is approved by Purchaser using the Lockbox method (a "**Lockbox Account**"). Merchant acknowledges and agrees that any funds deposited into the Lockbox Account by Merchant's Processor will remain in the Lockbox Account until the Applicable Amount is periodically withdrawn by Purchaser.

**5. Monthly True-Up.** Once every month (the "**True-Up Month**"), provided you have complied with the requirements set forth in this Section 5, you have the right to request a reconciliation (a "**True-Up**") of your Periodic Amount remittances (the "**Periodic Amount Remittances**") made in the immediately prior calendar month (the "**Prior Month**") against the Purchased Percentage of your actual Future Receivables received for that month (the "**Purchased Percentage Amount**"). For example, with respect to payments made in January (the Prior Month), you have the right to request a True-Up of those payments in February (the True-Up Month). The True-Up does not apply to direct split deals for so long as Purchased Percentage is Merchant's exclusive method of remittance. This Section 5 supplements the Purchase and Sale Terms set out on the front page of this Agreement and in Section 2(b), and provides important rights to Merchant.

You understand and agree that your request for a True-Up will not be effective, and that Purchaser will not be required to adjust your Periodic Amount Remittances against your Future Receivables, unless Purchaser (i) has received all Materials (as defined), (ii) in the manner specified below, (iii) by the end of the True-Up Month (collectively, the "**True-Up Conditions**"). More specifically, the True-Up Conditions are:

(1) *Materials*. Purchaser must receive true and complete copies of the Materials for the Prior Month. As used herein, "Materials" means, collectively: (i) Merchant's bank statements for each Approved Account; (ii) Merchant's merchant processing (credit card) statements; (iii) Merchant's accounts receivable (A/R) aging statements; (iv) any other payment records or receipts of Merchant that evidence Merchant's Future Receivables (please see definition at the end of Section 2(c)); and (v) any other documentation or information relating to Future Receivables for the Prior Month that Purchaser may reasonably request in writing.

(2) *Timing*. Purchaser must receive the Materials not later than the end of the True-Up Month.

It is your responsibility to comply with all True-Up Conditions not later than the end of the True-Up Month. If you have requested a True-Up and timely complied with all True-Up Conditions, Purchaser shall calculate whether the total Periodic Amount Remittances in any Prior Month were more or less than the total Purchased Percentage Amount for that month. Purchaser shall then, not later than ten (10) business days after the end of the True-Up Month, initiate an ACH to the Approved Account of Merchant, either as (A) a credit equal to the difference between the Periodic Amount Remittances and the Purchased Percentage Remittances or (B) a debit equal to the difference between the Purchased Percentage Remittances and the Periodic Amount Remittances.

Purchaser also has a right to request a True-Up. To facilitate Purchaser's True-Up, Merchant agrees to provide the Materials to Purchaser by the end of the True-Up Month upon Purchaser's request. Merchant also agrees to inform Purchaser during the True-Up Month if total remittances during the Prior Month were less than Purchaser's share (Purchased Percentage) of Merchant's Future Receivables for this period.

If (i) you do not comply with the True-Up Conditions on a timely basis, or (ii) Merchant is in Material Breach of the Agreement at the time of the True-Up request, then (1) Merchant expressly waives its right to a True-Up under this Section 5 for the relevant Prior Month and (2) the Purchased Percentage Amount for the applicable Prior Month will be deemed to equal the Periodic Amount Remittances for that month. Merchant hereby expressly authorizes Purchaser to effect the credit or debit to Merchant's Authorized Account as provided above and in the amounts specified above. Merchant further acknowledges and agrees that, absent mathematical

or technical error, the amounts calculated by Purchaser shall be conclusive. **You acknowledge that the foregoing limitations and requirements are fair and reasonable in order to allow Purchaser to process payment reconciliation requests, and that Purchaser would not have entered into this Agreement without these provisions.** In the event that Purchaser determines that a True-Up is appropriate for three successive months, the parties may discuss an adjustment to the Periodic Payment amount, subject in all cases to Purchaser's discretion and mutual written agreement.

**6. REPRESENTATIONS, WARRANTIES AND COVENANTS. Merchant, jointly and severally on behalf of itself and any subsidiary or affiliate of Merchant whose accounts are included in Future Receivables, hereby represents, warrants and covenants that, as of the date of the Agreement and at all times thereafter until the Amount Sold, together with any fees, charges, and Costs of Collection as applicable, has been remitted to Purchaser in full:**

A. Provisions Relating to the Integrity of this Agreement.

(i)      You will use all amounts funded under this Agreement solely for general working capital purposes in Merchant's business, and for no other purpose.

(ii)     Merchant's Future Receivables are not subject to any claims, charges, liens, restrictions, encumbrances or security interests of any nature whatsoever, unless expressly permitted by Purchaser or under this Agreement.

(iii)    You hereby confirm to Purchaser that this Agreement has been duly E-Signed by Merchant in accordance with Section 1 above, and that all of your signatures on this Agreement are true and genuine.

(iv)    You will not retain any company or individual for the purpose of negotiating a repurchase of the Future Receivables at a discount or otherwise changing the obligations under this agreement, or engage any legal or financial professional for advice regarding restructuring, renegotiating, or defaulting on any debt or other obligation; provided this provision shall not be construed to limit Merchant's right to consult with or retain legal counsel for any purpose in connection with this Agreement.

(v)     You will promptly sign (including via E-Signature) any and all documents that Purchaser, in its sole discretion, deems necessary (including signing up for electronic-inquiry-only access to Merchant's bank and processing accounts and providing Purchaser with any necessary information, authorizations and passwords in connection therewith) and provide Purchaser copies of all documents related to Merchant's card processing activity or financial and banking affairs within five (5) days of a request by Purchaser.

(vi)    You acknowledge that Merchant has received the benefit of services performed in the State New York, and has transacted and will continue to transact business within the State of New York during the term of this Agreement.

(vii)   You will not take any action that would or would be reasonably likely to breach any of the representations, warranties and covenants in this Section 6, and you agree to immediately notify Purchaser by phone and email of any breach or potential breach any provision of this Agreement.

**(viii)  You acknowledge that (a) the representations, warranties and covenants set forth in this Section 6 are fair and reasonable and designed to provide Purchaser a fair opportunity to receive the benefit of its agreement with Merchant; (b) are an essential component of the understanding and agreement between the parties; and (c) Purchaser would not have funded your business pursuant to this Agreement but for such provisions.**

B. Provisions Relating to the Remittance of Future Receivables.

(i)      You will remit Future Receivables to Purchaser up to the Amount Sold, together with any fees and charges incurred and any Costs of Collection as applicable, in accordance with the provisions of this Agreement, and you will not directly or indirectly cause the diminution of Future Receivables.

(ii)     You will not change the account name, account number, password or other access information relating to accounts from which ACH or electronic check payments are to be made or relating to any Processor without Purchaser's prior written approval in each case.

(iii)    You will immediately provide Purchaser and/or Service Provider with relevant account information, passwords and/or codes in order to ensure that Purchaser has full read-only access to your Approved Accounts.

(iv)    Until the Amount Sold has been received in full by Purchaser, you will not take any steps to avoid or circumvent your obligation to remit Future Receivables to Merchant, including without limitation: (w) taking any action that might discourage the use of credit cards, debit cards or other payment cards by Merchant, and you will not permit any event to occur that may have an adverse effect on the use, acceptance or authorization of credit cards, debit cards, or other payment cards (x) changing or adding credit card processors without the prior written approval of Purchaser, (y) amending or terminating the processing agreement with the credit card processor approved by Purchaser or (z) putting a stop order or blocking any ACH or other remittance of Future Receivables to Purchaser, or taking any voluntary action that results in a stop order or block.

(v)     You will make reasonable efforts to inform Purchaser if the Approved Account lacks sufficient funds such that a debit by Purchaser will result in a bounced or rejected debit.

(vi)    You will permit Purchaser or its agent to conduct a site inspection of Merchant's business, including an inspection of Merchant's credit card terminals, without prior notice to you.

**C.** **Provisions Relating to the Conduct of Merchant's Business.**

(i)      You will continue to conduct Merchant's business consistent with past practice and will not change its business location(s) or name(s) or the location of any Collateral (as defined) or temporarily close any location without Purchaser's prior written approval Purchaser.

(ii)      You will not permit any other person or company, including without limitation a franchisor or subcontractor, to assume or take over the operation and/or control of Merchant's business or business location(s).

(iii)      You have no intention to, and, until the Amount Sold has been remitted in full to Purchaser, you will not, (a) sell, transfer, pledge or encumber Merchant's ownership interest (e.g. stock or membership interest), assets or business to any person or entity, (b) enter into any transaction that results in any change in voting control, ownership control or effective control of the business or assets of Merchant, or (c) sell, assign, transfer or cancel Merchant's commercial lease or any material license to any person or entity.

(iv)      You have not sold, pledged, transferred or otherwise encumbered the Future Receivables or any portion thereof to another party, and will not do so until Purchaser's receipt in full of the Amount Sold of Future Receipt, plus any fees or charges as provided herein, including any Costs of Collection, other than in connection with a financing approved by Purchaser in writing beforehand.

(v)      You will not take any action that will result in any of your Approved Accounts being restrained by or on behalf of any third-party.

(vi)      You will not incur indebtedness, either (x) on behalf of Merchant, or (y) any principal or affiliate if this could result in the diminution or diversion of Future Receivables, including without limitation receivables financing or bank or other debt, excluding trade payables and other such indebtedness incurred in the ordinary course of Merchant's business.

(vii)      You have not and will not incur any, material liabilities not disclosed to Purchaser in writing, either on behalf of Merchant or any principal or affiliate that would result in the diminution, encumbrance, or diversion of Future Receivables.

**D.** **Provisions Relating to the Information and Documents Provided to Purchaser.**

(i)      All information and documentation you have provided to Purchaser prior to the funding of this Agreement is true and complete, including without limitation the application, the Funding Call, accounts receivable (A/R) aging statements, all other financial documents provided to Purchaser (including without limitation the Materials provided to Purchaser in connection with the True-Up in Section 5) and Approved Account information, are true and correct and accurately reflect Merchant's financial condition and results of operations.

(ii)      You have disclosed to Purchaser all material information and documents relating to its business, cash flow revenues and liabilities (including without limitation: pending or threatened claims or lawsuits, contingent liabilities, and actual or potential claims under contracts or purchase orders). No information or documents so disclosed contains any untrue or misleading statement of a material fact or omits to state a material fact necessary to make the information contained therein not misleading.

(iii)      You will immediately inform Purchaser if and as soon as: (a) a Material Breach has occurred or is likely to occur; (b) any of the information specified in in this subparagraph(D) is no longer true and correct and no longer accurately reflect Merchant's financial condition and results of operations; (c) a judgment or lien or levy of any kind is entered against Merchant or its business or assets or any Guarantor; (d) Merchant or any Guarantor is the subject of any pending or threatened lawsuit or arbitration; (e) Merchant or any Guarantor engages any legal or financial professional for advice regarding restructuring, renegotiating, or defaulting on any debt or other obligation, whether through bankruptcy or another process; (f) Merchant or any Guarantor becomes aware of any potential filing against Merchant including without limitation any bankruptcy or legal petition, or (g) there is any other material adverse change in the business, financial condition or prospects of Merchant.

**E.** **Other Representations, Warranties and Covenants.**

(i)      Merchant is financially solvent (*i.e.*, the value of its assets is more than its liabilities) as of the Effective Date.

(ii)      Neither Merchant nor any of its principals (including any Guarantor) has filed bankruptcy petition prior to the Effective Date, and as of the Effective Date, is not contemplating filing a bankruptcy, petition, declaring insolvency, seeking reorganization, making of a general assignment for the benefit of creditors, or commencing any other similar action, or contemplating the suspension of or closing Merchant's business and has not engaged any legal or financial professional to seek advice regarding filing bankruptcy or any similar reorganization process.

(iii)      You have and are in compliance with all permits, licenses, approvals, consents and authorizations necessary to conduct Merchant's business and will timely pay all necessary taxes, including but not limited to employment and sales and use taxes, and shall timely make any payments that Merchant is required to make pursuant to, and in accordance with the requirements of, any tax payment programs in which Merchant participates. You conduct your business in compliance with all applicable law.

(iv)      You currently have and will maintain insurance in such amounts and against such risks as are customary and necessary to protect Merchant's business, will not reduce any existing insurance coverage, and will promptly show proof of such insurance upon demand.

· **F.** **Representations, Warranties and Covenants of both Parties.** Each party hereby represents, warrants and covenants that:

    (i)    such party has duly authorized the execution, delivery and performance of this Agreement, including without limitation the execution of this Agreement by electronic means;

    (ii)    the execution delivery or performance of this Agreement will not (i) conflict with any other agreement, commitment or obligation of such party or any court order, administrative order or decree, law or regulation to which Merchant or any of its material subsidiaries is a party or by which it is bound; or (ii) require the consent of any individual, entity or governmental or regulatory agency;

    (iii)    such party will reasonably cooperate with the other party in order to fulfill the objectives of the transactions contemplated by this Agreement.

## 7. Material Breach.

    **A.** **Material Breach.** Any of the following actions taken directly or indirectly by or on behalf of Merchant will constitute a "Material Breach," without any prior notice from Purchaser:

    (i)    The breach of any representation, warranty, covenant or agreement set forth in this Agreement;

    (ii)    Merchant interferes with Purchaser's right to collect the Amount Sold;

    (iii)    Except as expressly otherwise provided herein, Merchant becomes subject to any civil judgment or garnishment following the date of the Agreement;

    (iv)  Merchant takes any affirmative steps (including, without limitation, executing a term sheet or definitive documentation) or threatens to take any action prohibited by this Agreement that, if effected, would constitute a Material Breach.

    **B.** **Limitations on Material Breach.** Notwithstanding any other provision of this Agreement,

    (i)    If the aggregate Future Receivables remitted to Purchaser pursuant to this Agreement are less than the stated Amount Sold despite Merchant's best efforts to operate its business in compliance with this Agreement in good faith, and Merchant has not violated any other provision of this Agreement, such diminution of Future Receivables shall not of itself be deemed a Material Breach.

    (ii)    The filing for bankruptcy or insolvency of Merchant is not in itself Material Breach of this Agreement.

## 8. Purchaser Remedies upon Material Breach.
Merchant agrees that, upon the occurrence of a Material Breach, Purchaser may, and Merchant hereby authorizes Purchaser to, pursue any and all of the following remedies, to the extent permitted by law, without prior notice to Merchant:

    (a)    Purchaser shall be entitled to receive all Contract Damages (as defined) from Merchant.

    (b)    Purchaser will be entitled to recover from Merchant all Costs of Collection.

    (c)    Purchaser may withdraw funds from any of Merchant's bank accounts, including any Approved Account, by ACH, up to an amount equal any Amount Sold, *plus* unpaid fees and charges under this Agreement, if any, and Purchaser's costs and expenses relating to this Agreement (including without limitation, all Costs of Collection).

    (d)    Purchaser may exercise any and all remedies available, including but not limited to remedies under the Uniform Commercial Code (the "UCC") of the applicable jurisdiction including without limitation: (1) freezing of Approved Accounts, (2) levying or foreclosing on Approved Accounts, and (3) seizing Collateral in any Approved Account or at the business location of Merchant or any Other Business, Successor Company or Guarantor, as applicable, including seizure by local sheriff and/or marshal.

    (e)    Without limiting the foregoing, Purchaser shall also be entitled to all remedies available to it at law or in equity.

**You acknowledge that Purchaser has purchased any and all interests in the Amount Sold of Future Receipts and Merchant has no further interest of any kind in the Amount Sold of Future Receipts. The Amount Sold of Future Receipts and any other fees and charges under this Agreement shall not be subject to the application of or deduction for any claim, set-off, disability, defense (whether substantive or procedural) or counterclaim of Merchant. This Agreement and each of Your obligations under this Agreement shall remain in effect until Purchaser's receipt in full of the Amount Sold of Future Receipts, plus any fees or charges as provided herein, including any Costs of Collection. Upon the occurrence of any Material Breach, you hereby (1) acknowledge and agree that Purchaser shall be entitled to receive the Contract Damages from Merchant; and (2) until the Amount Sold and any other fees and charges incurred under this Agreement have been received in full by Purchaser, irrevocably and unconditionally (i) appoint Purchaser as Merchant's agent coupled with an interest and attorney-in-fact with full authority to take any action or execute (via E-Signature or otherwise, "execute") any instrument or document in the name of Merchant, solely for the purpose of securing the**

Contract Damages or otherwise to enforce its rights with respect to any Collateral and (ii) acknowledge that Purchaser may pursue any remedy available at law (including those available under the provisions of the UCC) or in equity to enforce any agreements or satisfy any obligations to Purchaser, and includ- ing without limitation freezing Merchant's credit card processing accounts and assigning any invoices evidencing accounts receivable purchased hereunder to Purchaser. As used herein, "**Contract Damages**" means an amount equal to the Amount Sold, less all prior receipts of Future Receivables by Purchaser plus any applicable fees and charges under this Agreement; and "**Costs of Collection**" means, as permitted by law, any and all costs, fees and expenses, including reasonable attorneys' fees and other professional fees, marshal fees, sheriff fees and disbursements incurred by Purchaser after any Material Breach, in connection with the defense, protec- tion or enforcement of Purchaser 's rights under this Agreement and/or the Guaranty, including without limitation: (1) any court action, administrative proceeding, arbitration or mediation or other collection activities, taken against Merchant or any Other Business, Successor Company or Guarantor; (2) any levy or foreclosure upon Collateral; or (3) any bankruptcy proceeding involving Merchant or any Guarantor, Other Business or Successor Company. Without limiting the foregoing, Merchant acknowledges that Costs of Collection will include Purchaser's reasonable in-house collection costs of not less than $2,500 for any Material Breach. The parties hereby agree that, following arms' length negotiations and opportunity to consult with counsel, the Contract Damages amount is fair and reasonable and does not constitute a penalty. In the event of any collection efforts or action for the collection of the Amount Sold and other amounts to be received by Purchaser under this Agreement, Purchaser shall be entitled to recoup its reasonable legal fees, court costs and related expenses from Merchant and any Other Business, Successor Company and/or Guarantor.

**9. Sale of Future Receivables. (a)** *Security Interest*. As provided above, the parties agree that the purchase and sale of Future Receiv- ables evidences is not, intended to be, and will not be construed as, a loan from Purchaser to Merchant. Merchant and Guarantor hereby grant to Purchaser, in the name of Purchaser or its duly authorized representative, a first priority, continuing security interest, (unless a third-party lien has been consented to by Purchaser in writing prior to the effective date) in and to: (i) the Amount Sold of Future Receivables of Merchant (and any subsidiary or other person or entity whose accounts are included in Future Receivables) purchased pursuant to this Agreement; (ii) all property used in Merchant's business (including the business assets of any subsidiary or other person or entity whose accounts are included in Future Receivables), including all accounts, chattel paper, deposit accounts, documents, fixtures, general intangibles, instruments, equipment and inventory as those terms are defined in Article 9 of the UCC, as amended, whether now or hereafter owned or acquired by Merchant (and/or any subsidiary or other person or entity whose accounts are included in Future Receivables) and wherever located; (iii) all proceeds of such property described in clause (i) and/or (ii), as that term is defined in Article 9 of the UCC; (iv) all business assets of Gaurantor; (v) upon a Material Breach, the assets, business property and collateral of any Other Business, Successor Company or Guarantor; and (vi) any additional collateral as may be mutually agreed between Merchant and/or any Guarantor , on the one hand, and Purchaser, on the other hand in writing (collectively, the "**Collateral**").

Merchant and Guarantor acknowledge that any electronic signature provided for this Agreement (including the E-Signature) shall be deemed fully "authenticated" under Article 9 of the UCC for purposes of creating and perfecting the foregoing security interest. Upon Merchant's and Guarantor's express authorization and consent provided in this Agreement, Purchaser shall have the right to cause any UCC filing and/or recording relating to this Agreement (including filing a UCC-1 financing statement) at any time with any governmental agency and/or office (including the office of the Secretary of State), including, without limitation, to perfect Purchaser's rights and interests in the Collateral as provided in this Agreement. In addition, upon a Material Breach, Purchaser may exercise any rights and remedies available under the UCC and applicable law against Merchant and/or Guarantor, and including without limitation freezing Merchant's credit card processing accounts, the costs of which shall be borne by Merchant, as provided above. Merchant and Guarantor hereby acknowledge and consent that Merchant will not pledge, grant, transfer or otherwise encumber any security interest in its Future Receivables to any other person or entity until Purchaser has received the Amount Sold, plus any assessed fees and Costs of Collection, other than in connection with a financing approved by Purchaser in writing beforehand, in full.

**(b)** *Further Assurances*. You agree to execute any documents or take any action on behalf of Merchant and/or Guarantor in connection with this Agreement as Purchaser deems necessary to perfect or maintain Purchaser's security interest in the Collateral as provided in this Agreement.

**10. CERTAIN WAIVERS.** Merchant hereby irrevocably and unconditionally waives: (i) promptness, diligence, notice of acceptance, notice of presentment, demand, protest dishonor or default, and any other notice with respect to the Collateral; (ii) any claim that Purchaser exhaust any right, by statute or otherwise, or take any action against the Merchant or any other person or entity or the Collateral; (iii) any defense relating to the marshalling of assets or similar doctrine; (iv) all defenses of any kind, both substantive and procedural, to enforcement it may have, including any defenses relating to the proper service of any pleadings or other court documents; and (v) the right to assert any set-offs or counterclaims, whether legal, equitable or otherwise, against Purchaser or its affiliates. **BY SIGNING THIS GUARANTY, MERCHANT ACKNOWLEDGES THAT SUCH MERCHANT HAS PERMANENTLY WAIVED THE RIGHTS (1) TO START OR JOIN A CLASS ACTION; (2) TO TRIAL BY JURY; AND (3) TO RAISE DEFENSES AND COUNTERCLAIMS, TO THE MAXIMUM EXTENT PERMITTED BY LAW. UPON A MATERIAL BREACH OF THIS AGREEMENT BY MERCHANT, AN ACTION MAY BE FILED AGAINST EACH MERCHANT WITHOUT PRIOR NOTICE FOR PURCHASER'S CONTRACT DAMAGES AND COSTS OF COLLECTION .**

**11. Merchant Authorizations. (a)** *Credit Reporting Agencies*. You authorize Purchaser, from time to time, to contact any credit reporting or database service, Merchant's current, prior or third party card processors, and Merchant's current and prior banks (including without limitation the bank where any  Approved Account will be maintained) so that Purchaser may obtain whatever information Purchaser deems relevant, including without limitation Merchant's credit history, credit card, debit card and other payment card, processing and chargeback history.

**(b)** *Credit Reports and Information*. You authorize Purchaser to, from time to time, obtain credit reports or background reports on Merchant and its principals. Any such report(s) that Purchaser obtains may include, without limitation, a hard or soft credit pull, the business' or individuals' credit history or similar characteristics, employment and education verifications, social security verification, criminal and civil history, Department of Motor Vehicle records, any other public records, and any other information bearing on credit standing, credit capacity or character. Such reports will be used by Purchaser to determine (i) if it will proceed with the purchase of the Future Receivables from Merchant and (ii) after funding, if needed to assist Purchaser in the collection of Future Receivables. Merchant shall also provide and/or execute such further and additional documents, instruments, and writings as Purchaser may require in order to access and review any tax information (including tax returns) related to Merchant's business (including without limitation by executing a 4506T form with the Internal Revenue Service).

**(c)** *Recorded Calls; Contact*. You authorize Purchaser to monitor and/or record its telephone calls with Merchant and its principals, owners, employees or agents to confirm the contents of conversations, for evaluation by supervisors, training, monitoring for compliance, and for collections. You further agree that (i) you have established a business relationship with Purchaser, Purchasers employees and agents; (ii) you may be contacted from time-to-time regarding this Agreement or other business transactions; (iii) such communications and contacts are not unsolicited or inconvenient; and (iv)  contact may be made during normal business hours by phone, email or otherwise, using contact information provided by You, or Your agents or employees.

**(d)** *Power of Attorney*.  Until Purchaser has received the Amount Sold, plus any assessed fees and Costs of Collection, you hereby irrevocably, unconditionally, and jointly and severally appoint Purchaser as Merchant's agent coupled with an interest and attorney-in-fact, effective upon the occurrence and for the duration of any Material Breach, with full authority to enforce, execute or take any other action pursuant to any instrument or document, including without limitation any UCC filing, in the name of Merchant or other person or entity whose accounts are included in the definition of Future Receivables in Section 2(c), and also for purposes of Section 9(a). As your attorney-in-fact, upon such Material Breach, Purchaser shall, as permitted by law, have the  right to: (i) sign (including via E-Signature) any instruction letter or agreement on behalf of Merchant with Merchant's credit card processor(s) and/or any bank where Merchant maintains an Approved Account or any Other Business or Successor Company maintains an Approved Account, instructing such processor to freeze all account proceeds and remit such proceeds to Purchaser; (ii) authorize the levy or foreclosure on Approved Accounts and use the local sheriff and/or marshal to seize Collateral in any Approved Account or at the business location of Merchant or any Other Business or Successor Company, as applicable; (iii) file any claims, actions or judgments or take any action or institute any proceeding, including without limitation any action against any Other Business, Successor Company, the principals thereof or any Guarantor, which Purchaser may deem necessary for the collection of any Contract Damages and Costs of Collection); (iv) direct customers or account debtors to make payment directly to Purchaser; (v) collect Contract Damages and Costs of Collection from any Collateral; (vi) endorse checks, notes or other documents, including any documentation requested by Purchaser in furtherance of the power of attorney described herein) and/or (vii) obtain and adjust insurance.

·   **(e)** *Rights of Purchaser.* Without any prior notice to you and without affecting or reducing the liability of Merchant or any Guarantor hereunder, upon a Material Breach, Purchaser may: (1) compromise or settle any claim, liability or obligation of Merchant under this Agreement; (2) grant other concessions or indulgences to Merchant in respect thereof; (3) release, surrender, dispose of (including through foreclosure, and whether or not by judicial proceedings), exchange, modify, impair, fail to perfect, or extend the period of duration or time for the performance or discharge of any or all Collateral, including without limitation the Collateral of any Other Business or any Successor Company; and (4) take any action authorized in Section 11(d). **In addition, upon a Material Breach, Purchaser has the right to enforce any remedy set forth in this Agreement, separately or together at Purchaser's discretion.** The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

**(f)** *Acknowledgments and Waiver.* Your signature on the signature page hereof on behalf of Merchant, will confirm that you have read and understand all terms and conditions of this Agreement. Merchant hereby irrevocably and unconditionally waives: (i) promptness, diligence, notice of acceptance, notice of presentment, demand, protest dishonor or default, and any other notice with respect to any obligations of Merchant with respect to the Collateral; (ii) any requirement that Purchaser exhaust any right, by statute or otherwise, or take any action against Merchant or any other person or entity or any Collateral; (iii) any defense relating to the marshalling of assets or similar doctrine; (iv) all defenses of any kind, both substantive and procedural, to enforcement it may have (now or in the future) and (v) the right to assert any set-offs or counterclaims, whether legal, equitable or otherwise.

**12. Limitation of Liability.** YOU HEREBY AGREE THAT, REGARDLESS OF THE CLAIMS YOU MAY HAVE AGAINST PURCHASER TO THE EXTENT PERMITTED BY LAW, YOUR SOLE REMEDY WILL BE MONEY DAMAGES NOT TO EXCEED THE GREATER OF (i) THE AMOUNT OF FUNDS OVERPAID TO PURCHASER, IF ANY, AND (ii) **FIVE THOUSAND DOLLARS ($5,000)**, AND THAT YOU WILL NOT BE ENTITLED TO, YOU HEREBY WAIVE, ANY AND ALL CLAIMS FOR, PUNITIVE, EXEMPLARY, CONSEQUENTIAL, LOST PROFITS, STATUTORY, OR SPECIAL DAMAGES OF ANY KIND, EVEN IF MERCHANT HAS BEEN ADVISED OF THE POSSIBLITY OF SUCH DAMAGES. IF MERCHANT FILES ANY CLAIM OR ACTION AGAINST PURCHASER (X) IN DEROGATION OF THIS SECTION 12 OR (Y) THE MATTER IS DISMISSED OR (Z) PURCHASER PREVAILS IN THE MATTER, YOU AGREE TO PAY ALL OF PURCHASER'S COSTS OF COLLECTION INCURRED IN THE MATTER.

**13. Indemnity.**   Merchant hereby, jointly and severally with each Guarantor, agrees to indemnify, defend and hold Purchaser harmless from and against any and all direct and third party suits, costs, causes of action, judgments, complaints, orders, and claims (each a **"Claim"**), together with any and all liabilities, losses, obligations, damages and penalties of any kind incurred by Purchaser or its affiliates, including without limitation Contract Damages, reasonable attorneys' fees and disbursements and all Costs of Collection, arising from or relating to any Claim that Merchant has breached this Agreement or that any representation, warranty, covenant, disclosure or statement Merchant has made is not accurate in any respect or for any intentional or willful misconduct of Merchant, including in connection with the preservation, protection, or enforcement of any rights of Purchaser under this Agreement, and in any case commenced by or against Merchant or any Guarantor under the United States Bankruptcy Code (Title 11, United States Code) or any similar or successor statute. Purchaser will notify Merchant of any claim for indemnity hereunder, select counsel of Purchaser's choice and Merchant will promptly pay all legal fees, defense costs and other expenses incurred by Merchant and promptly pay to Purchaser any judgment or other Claim amounts due and payable, including without limitation all Contract Damages and Costs of Collection.

**14. Access and Retrieval of Information. (a)** *Authorization.* From and after the Effective Date, until the Amount Sold has been remitted to Purchaser, you authorize Purchaser to (i) access and collect any information relating Merchant's business (including information relating to Merchant's principals) maintained online by third-party financial institutions with which Merchant has relationships, maintains accounts or engages in financial transactions, (ii) access third party sites designated by Merchant, on Merchant's behalf, to retrieve information requested by Merchant, and to register for accounts requested by Merchant and (iii) access third party internet sites, servers or documents, retrieve information, and use Merchant's information for the purposes described herein. Purchaser may work with one or more online financial service providers under contract to access this account information and review bank statements, as determined by Purchaser at its sole discretion without notice to you (collectively, **"Service Provider"**). **You will immediately provide Purchaser and/or Service Provider with relevant account information, passwords and/or codes in order to ensure that Purchaser has full read-only access to your Approved Accounts.** Purchaser's current Service Providers is Yodlee (www.Yodlee.com), but Purchaser has the right in its sole discretion to change the Service Provider at any time without prior notice. Merchant acknowledges that Service Provider is an independent contractor not affiliated with Purchaser, that Purchaser is not responsible for any actions of a Service Provider, and that you agree not to seek damages or other compensation from Purchaser based on any action or inaction by a Service Provider.

**(b)** *Disclaimer of Warranty.* YOU EXPRESSLY UNDERSTAND AND AGREE THAT MERCHANT'S USE OF THE SERVICE PROVIDER'S SERVICE (THE "SERVICE") AND ALL INFORMATION, PRODUCTS AND OTHER CONTENT (INCLUDING THAT OF THIRD PARTIES) INCLUDED IN OR ACCESSIBLE OR DOWNLOADED FROM THE SERVICE IS AT MERCHANT'S SOLE RISK. THE SERVICE IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS. PURCHASER AND SERVICE PROVIDER EXPRESSLY DISCLAIM ALL WARRANTIES OF ANY

11

KIND AS TO THE SERVICE AND ALL INFORMATION, PRODUCTS AND OTHER CONTENT (INCLUDING THAT OF THIRD PARTIES) INCLUDED IN OR ACCESSIBLE FROM THE SERVICE, WHETHER EXPRESS OR IMPLIED. MERCHANT AGREES THAT NEITHER PURCHASER OR SERVICE PROVIDER NOR ANY OF THEIR AFFILIATES WILL BE LIABLE FOR ANY HARM DAMAGES OF ANY KIND, EVEN IF THE PROVIDER HAS BEEN ADVISED PREVIOUSLY OF THE POSSIBILITY OF SUCH DAMAGES.

(c) *Service Content*. Merchant is permitted to use content delivered to Merchant through the Service only on the Service. Merchant may not copy, reproduce, distribute, or create derivative works from this content. Further, you agree not to reverse engineer or reverse compile any of the Service technology, including but not limited to, any Java applets associated with the Service. Merchant is licensing to Purchaser and its service providers, including Service Provider, any information, data, passwords, materials or other content (collectively, **"Content"**) Merchant provides through or to the Service. Purchaser and Service Provider may use, modify, display, distribute and create new material using such Content to provide the Service to Merchant.

**15. Governing Law; Venue; Personal Jurisdiction; Consent to Service; Waiver of Jury Trial and Class Action; Statute of Limitations; Arbitration.** (a) *Governing Law*. This Agreement and all transactions hereunder, including without limitation the purchase and sale of Future Receivables as specified herein, will be governed by and enforced exclusively in accordance with the internal laws of the **State of New York**, without regard to conflict of laws principles. You expressly acknowledge that: (i) Purchaser maintains its principal office in the State of New York; (ii) the Funding Call and customer service will take place with Purchaser's representatives in the State of New York; (iii) all funding to and payments from Merchant under this Agreement will be processed through Purchaser's Bank branches in New York; and (iv) the purchase and sale of Future Receivables pursuant to this Agreement shall take place in New York. **Accordingly, the parties agree that this Agreement and its subject matter bears a "significant, material and reasonable relationship" with the State of New York.**

(b) *Venue and Personal Jurisdiction*. Subject to <u>Section 15(g)</u>, the parties irrevocably consent to the exclusive jurisdiction and venue of state courts located in: (x) the State of New York; (y) the State of Merchant's incorporation or formation or where its operations, offices, assets or domicile are located or (z) the state where any Guarantor resides. **Merchant and each Guarantor hereby irrevocably and unconditionally waives any and all claims and objections to jurisdiction and/or venue as per this provision.**

(c) *Consent to Service*. Merchant and each Guarantor waive personal service of any and all process upon Merchant and Guarantor and consent that service of process may be made by certified or registered mail. **Merchant and each Guarantor hereby irrevocably and unconditionally waives any and all claims and objections to service of process as per this provision.**

(d) *Waiver of Jury Trial and Class Action*. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT THAT THEY MAY HAVE TO (1) TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTION (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY); AND (2) ASSERT ANY CLAIMS AGAINST ANY OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION;(INCLUDING CLASS ARBITRATION), EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY PUBLIC POLICY. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST ANY OTHER PARTY, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY WILL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION; AND (3) THE FOREGOING WAIVERS ARE ESSENTIAL TERMS OF THIS AGREEMENT. YOU UNDERSTAND AND AGREE THAT, BY SIGNING THIS AGREEMENT, (1) YOU ARE PERMANENTLY WAIVING YOUR RIGHT TO A JURY TRIAL AND (2) YOU MUST BRING CLAIMS, INCLUDING IN COURT, ARBITRATION OR ANY OTHER LEGAL PROCEEDING, AGAINST PURCHASER ONLY IN YOUR INDIVIDUAL OR CORPORATE CAPACITY, AS APPLICABLE, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.

(e) *Waiver of Consumer Defenses*. Merchant and each Guarantor hereby waive any defense, regardless of the actual use of the Funded Amount by Merchant or Guarantor, claiming that the Funded Amount was made to Merchant or Guarantor for personal, consumer, family or household purposes. Merchant and each Guarantor understand and agree that, as set forth in Section 1 above, the amount funded is solely for business purposes and for the operation of your business as set forth in this Agreement.

(f) *Reduced Statute of Limitations*. Each party hereto agrees, after consultation with counsel, that: (i) it will not bring any claim, action or legal or administrative proceeding of any kind or under any legal or equitable theory or request for relief of any kind to enforce or arising out of or relating to in any material respect this Agreement (collectively, **"Action or Proceeding"**) after the date one (1) year from the sooner to occur of (x) the receipt of the Amount Sold in full by Merchant to Purchaser and (y) the effective date of termination for any reason of this Agreement (such period, the **"Limitations Period"**); (ii) all statutes of limitations under

applicable law shall in all cases be limited to the Limitations Period; and (iii) the Limitations Period is a reasonable period of time in which to bring an Action or Proceeding under or relating to this Agreement.

(g) *Arbitration*. Notwithstanding any provision hereof, and excluding any action by Purchaser for injunctive relief under this Agreement, each party agrees to confidential arbitration of all disputes and claims arising out of or relating to this Agreement, including issues relating to the arbitrability of any dispute or claim (collectively, "claims") at the request of the other party. If a party seeks to have a dispute settled by arbitration, that party must first send to the other party, by certified mail, a written Notice of Intent to Arbitrate (the "**Notice**"). If the parties do not reach an agreement to resolve the claim within thirty (30) days after the Notice is received, Purchaser and Merchant agree that the claim will be resolved by a final and binding arbitration proceeding with JAMS, Inc. ("**JAMS**") in New York County, State of New York, under the Optional Expedited Arbitration Procedures then in effect. The parties agree that, except as otherwise expressly required by JAMS rules, (i) the party filing arbitration shall pay all JAMS filing fees and reasonable administrative fees; (ii) thereafter, each party shall bear its own arbitration costs and fees, including witness fees and attorneys' fees; and (iii) each party shall bear an equal share of the arbitrator's fees; provided, if the arbitrator finds that either the substance of the claims of any party or the relief sought by any party is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), then the arbitrator shall award the other party all of its costs and fees of the arbitration, including witness and reasonable attorneys' fees. Purchaser and Merchant agree that, except as expressly otherwise provided herein, (i) arbitration is the required and exclusive forum for the resolution of all claims and (ii) to the fullest extent permitted by law, Purchaser and Merchant are each permanently giving up their right to a jury trial in any forum and the right to a judicial forum for the resolution of any and all claims. Further, the parties agree that the arbitrator may not consolidate proceedings for more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding, and that if this specific provision is found unenforceable, then the entirety of this arbitration clause shall be null and void.

**MERCHANT MAY OPT OUT OF ARBITRATION. In order to opt out of this Arbitration Clause, Merchant shall send Purchaser a written notice executed by Merchant, stating that Merchant does not want the arbitration clause set forth in this Section 15(g) to apply to the Agreement. For any opt out to be effective, an opt out notice, duly executed by Merchant, must be sent to the following address by registered mail, within ten (10) business days after the Effective Date (*i.e.*, the date this Agreement is funded, time being of the essence, to: Itria Ventures LLC, One Penn Plaza, Suite 4530, New York, NY 10119, Attention: President and General Counsel.**

**16. Miscellaneous.** (a) *Entire Agreement*. This Agreement, including the Guaranty, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all previous agreements and understandings, whether written or oral. This Agreement may only be modified by written amendment signed (including E-Signature) by the parties, and shall inure to the benefit of the parties and their respective successors and permitted assigns. Upon the termination of this Agreement for any reason,   Sections 6, 7, 8, 9, 10, 11(d), 12, 13, 14(b), 15 and this Section 16 shall remain in full force and effect.

(b) *Assignment and Delegation*. **You may not assign this Agreement or any rights herein or delegate any duties, in whole or in part, without the prior written consent of Purchaser, and any purported assignment or delegation by Merchant without such consent shall be void *ab initio*.** Purchaser may assign, sell and transfer this Agreement or any rights herein, to any party, without the consent of or notice to Merchant.

(c) *Notices*. All communications between the parties with respect of, or notices, requests, directions, consents or other information sent under, this Agreement shall be in writing and delivered by email (with proof of transmission) to an email address of the other party at which such party normally and customarily receives email communications as of the time the notice is sent or, at the request of any party, by Federal Express or other internationally recognized courier (with signature). All such communications and notices shall be effective upon receipt or sending with proof of transmission.

(d) *Service of Process*. Merchant agrees and hereby consents that service of process for any lawsuit or arbitration involving Merchant or any of its principals may be made by Purchaser at Merchant's primary business address.

(e) *No Waiver*. There will be effected no waiver by failure on the part of Purchaser to exercise, or delay in exercising, any right under this Agreement, nor will any single or partial exercise by Purchaser of any right under this Agreement preclude any other future exercise of any right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

(f) *Severability*. The illegality, invalidity or unenforceability of any provision of this Agreement under the law of any jurisdiction shall not affect its legality, validity or enforceability under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision.

13

(g) *Further Assurances.* The parties agree to execute such further and additional documents, instruments, and writings as may be necessary, proper, required, desirable, or convenient for the purpose of fully effectuating the terms and provisions of this Agreement.

(h) *Counterparts; Telecopies.* This Agreement may be signed in multiple counterparts, all of which taken together shall be deemed to constitute one and the same original instrument. Transmission by email, telecopier, facsimile or other form of electronic transmission of a signed counterpart of this Agreement shall be deemed a signed original.

(i) *Consent to Electronic Transactions.* **You expressly consent to conducting this transaction by electronic means, including without limitation email communications, electronic signatures, the creation of a duly authenticated security interest by electronic signature, and the retention and storage of electronic records, to the maximum extent permitted by law.** Merchant agrees that Purchaser does not need to provide Merchant with a paper copy of any notice or document relating to this Agreement unless specifically requested by Merchant in writing.

(j) *Electronic Signatures.* The E-Signature(s) to this Agreement (and any other electronic symbol or process expressly approved and authorized by Purchaser) or to any addendum, amendment or other agreement or document related to this Agreement, shall have the same legal validity and enforceability as a manually executed signature or use of a paper-based recordkeeping system to the fullest extent permitted by applicable law, including without limitation the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any similar state law based on the Uniform Electronic Transactions Act, and Merchant and Guarantor hereby waive any objection to the contrary.

**[END OF AGREEMENT]**

**GUARANTY OF PERFORMANCE**

(a) *Guaranty of Performance*. By signing this Guaranty of Performance (this **"Guaranty"**) in accordance with this Agreement on the signature page hereof as "Guarantor," each Guarantor hereby assumes and, jointly and severally, guarantees Merchant's full, complete and timely performance of all of Merchant's obligations under this Agreement. Purchaser may from time to time proceed to enforce its rights against each Guarantor, prior to, contemporaneously with or after any enforcement against Merchant or without any enforcement against Merchant, or enforcing its rights in any Collateral that Purchaser may hold pursuant to the Agreement. The obligations of Guarantors are unconditional and absolute, and shall remain in effect and enforceable by Purchaser until the entire Amount Sold has been received by Purchaser, including (i) any assessed fees and Costs of Collection, whether or not litigation is commenced and (ii) the return of any amount of remittances set aside or returned by Purchaser for any reason. If there is more than one Guarantor, the liability of all such guarantors shall be joint and several. The Guarantor's signature on the Guaranty signature page hereof as a "Guarantor" will conclusively evidence that the Guarantor has read and understands all terms and conditions of this Agreement.

(b) *Affirmations*. Without limiting the foregoing, each Guarantor hereby reaffirms all representations and warranties, covenants and acknowledgements of Merchant in this Agreement, including without limitation: (i) the fundamental terms, conditions and waivers in Section 1, including that this Agreement evidences the purchase and sale of Future Receivables and does not constitute a loan; (ii) the representations, warranties and agreements of Merchant in Section 6; (iii) the authorizations for Purchaser to contact credit reporting agencies, access credit reports and information and effect credit pulls with respect to Guarantor, as per Section 11(a) and (b); (iv) the power-of attorney designation and other rights of Purchaser set forth in Section 11(d); (v) the limitation of Purchaser's liability in Section 12; (vi) the legal provisions and waivers in Section 15 (Governing Law; Venue; Personal Jurisdiction; Consent of Service; Waiver of Jury Trial and Class Action; Statute of Limitations; Arbitration); (vii) Purchaser's remedies upon Material Breach by Merchant with respect to Approved Accounts, as set forth in Sections 8 and 11(d); and (viii) the waivers set forth in subparagraph (c) below. Further, each Guarantor represents and warrants that he or she is a legal resident of the United States of America. Guarantor also consents to service of any pleadings or other court documents by electronic mail at the Merchant's email address provided by Merchant.

(c) *Waivers*. Each Guarantor hereby irrevocably and unconditionally waives: (i) promptness, diligence, notice of acceptance, notice of presentment, demand, protest dishonor or default, and any other notice with respect to the Collateral; (ii) any claim that Purchaser exhaust any right, by statute or otherwise, or take any action against the Merchant or any other person or entity or the Collateral; (iii) any defense relating to the marshalling of assets or similar doctrine; (iv) all defenses of any kind, both substantive and procedural, to enforcement it may have, including any defenses relating to the proper service of any pleadings or other court documents; and (v) the right to assert any set-offs or counterclaims, whether legal, equitable or otherwise, against Purchaser or its affiliates. BY SIGNING THIS GUARANTY, EACH GUARANTOR ACKNOWLEDGES THAT SUCH GUARANTOR HAS PERMANENTLY WAIVED THE RIGHTS (1) TO START OR JOIN A CLASS ACTION; (2) TO TRIAL BY JURY; (3) TO RAISE DEFENSES AND COUNTERCLAIMS, TO THE MAXIMUM EXTENT PERMITTED BY LAW; AND (4) TO CONTEST THE ENTRY OF A LEGAL JUDGMENT AGAINST GUARANTOR. UPON A MATERIAL BREACH OF THIS AGREEMENT BY MERCHANT, MAY BE FILED AGAINST EACH GUARANTOR WITHOUT PRIOR NOTICE FOR PURCHASER'S CONTRACT DAMAGES AND COSTS OF COLLECTION.

(d) *Rights of Purchaser*. Without notice to or from any Guarantor and without affecting or impairing the liability of Guarantor hereunder, Purchaser may: (1) compromise or settle any claim, liability or obligation of Merchant under this Agreement; (2) grant other concessions or indulgences to Merchant in respect thereof; (3) amend or modify the Agreement in any manner with Merchant as provided therein; and (4) release, surrender, dispose of (including through foreclosure, and whether or not by judicial proceedings), exchange, modify, impair, fail to perfect, or extend the period of duration or time for the performance or discharge of any or all Collateral. Each Guarantor acknowledges that, upon a Material Breach of the Agreement by Merchant, Purchaser may without prior notice to Guarantor bring an action against each Guarantor as provided in Section 10, and thereafter domesticate such judgment in another jurisdiction at Purchaser's discretion, whether prior to, contemporaneously with or after any enforcement against Merchant or without any enforcement against Merchant. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

(e) *Enforcement Expenses*. After a Material Breach, each Guarantor agrees to pay or reimburse Purchaser for all costs, expenses and attorneys' fees and disbursements paid or incurred by Purchaser in endeavoring to collect and enforce the Agreement and/or this Guaranty, including in connection with the preservation, protection, or enforcement of any rights of Purchaser in any case commenced by or against Guarantor under the United States Bankruptcy Code (Title 11, United States Code) or any similar or successor statute.

**[END OF GUARANTY]**
**[SIGNATURE PAGE FOLLOW]**

15

IN WITNESS WHEREOF, (i) Merchant and Purchaser by their duly authorized officers have executed this Future Receivables Sale Agreement and (ii) each Guarantor has executed the **Guaranty of Performance**, in each case on the date specified by the Notary below. By signing this Agreement, Merchant and each Guarantor hereby affirm to Purchaser that they have read and understand this Agreement, including without limitation the provisions referenced in Section 1 (Fundamental Terms, Conditions and Waivers). By signing the Guaranty, each Guarantor further affirms to Purchaser that such Guarantor has read and understands the Guaranty, including without limitation the affirmations and waivers specified therein.

**MERCHANT:** MARQUIS CATTLE COMPANY

**MERCHANT**

TAX ID #: _____454030573_____

By: X  *Cory Shannon Marquis*

Name: ___CORY SHANNON MARQUIS___

Title: _____Owner_____

By: X  ***BECKIE JO MARQUIS***

Name: ___BECKIE JO MARQUIS___

Title: _____Partner_____

By: X _____

Name: _____

Title: _____

By: X _____

Name: _____

Title: _____

**GUARANTOR**

X  *Cory Shannon Marquis*

Name: ___CORY SHANNON MARQUIS___

SS#: ___XXX-XX-9669___

X  ***BECKIE JO MARQUIS***

Name: ___BECKIE JO MARQUIS___

SS#: ___XXX-XX-4031___

**GUARANTOR**

X _____

Name: _____

SS#: _____

X _____

Name: _____

SS#: _____

**STATE OF** ___Virginia___ )
**COUNTY OF** ___Fairfax___ )

I, _____Mekdim Yemane_____, a Notary Public, do hereby certify that on this 16th day of ___March___, 2022 appeared before me ___CORY SHANNON MARQUIS & BECKIE JO MARQUIS___, the ___Owner/Partner___ of Merchant, and a Guarantor under the within Future Receivables Sale Agreement, each personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the foregoing agreement, and swore and acknowledged to me that he or she executed the same by and in the name of Merchant and/or as Guarantor, respectively, for the purpose and in the capacity therein expressed, and that the statements contained therein are true and correct.

Notarized online using audio-video communication

Notary Signature: *Mekdim Yemane*
Name of Notary: ___Mekdim Yemane___
Notary Commission Expires: ___08/31/2024___



Mekdim Yemane
REGISTRATION NUMBER
7907050
COMMISSION EXPIRES
August 31, 2024

## ADDENDUM TO THE FUTURE RECEIVABLES SALE AGREEMENT

This Addendum to the Future Receivables Sale Agreement (this "**Addendum**") shall be an integral part of the Future Receivables Sale Agreement, dated as of ___March___ __14__, __2022__, (the "**Agreement**") by and between _____ MARQUIS CATTLE COMPANY ("Merchant") on one hand, and Itria Ventures LLC ("**Purchaser**") on the other, and the performance of which is guaranteed by Merchant's undersigned principal(s) ("**Guarantor**"). All capitalized terms contained herein shall have the same meaning ascribed to them in the Agreement unless the context clearly requires otherwise.

NOW THEREFORE, it is agreed as follows:

1.   "Amount Sold" in the Purchase and Sale Terms of the Agreement shall be appended to include the following:

The Amount Sold shall be ___Three Hundred Ninety Nine Thousand Dollars___ ($ 399,000.00   ) if such amount is received by Purchaser not later than __May__ __14__, __2022__.

The Amount Sold shall be ___Four Hundred Six Thousand Dollars___ ($ 406,000.00   ) if such amount is received by Purchaser not later than __June__ __14__, __2022__.

2.   This Addendum shall be incorporated in the Agreement and shall be binding upon the undersigned and their respective successors and assigns. To the extent that there is an inconsistency between the provisions of this Addendum and the provisions of the Agreement, the provisions of this Addendum shall govern.

**[Signature page to follow]**

IN WITNESS WHEREOF, the parties below have executed this Addendum as of the date of the Agreement.

**PURCHASER**

**ITRIA VENTURES LLC**

By: _____

Name: _____

Title: _____

**MERCHANT**                                    **MERCHANT**

By: _Cory Shannon Marquis_                By: _____

Name: CORY SHANNON MARQUIS        Name: _____

Title: Owner                                        Title: _____

**MERCHANT**                                    **MERCHANT**

By: _BECKIE JO MARQUIS_                  By: _____

Name: BECKIE JO MARQUIS              Name: _____

Title: Partner                                      Title: _____

**GUARANTOR**                                  **GUARANTOR**

By: _Cory Shannon Marquis_              By: _____

Name: CORY SHANNON MARQUIS        Name: _____

**GUARANTOR**                                  **GUARANTOR**

By: _BECKIE JO MARQUIS_                  By: _____

Name: BECKIE JO MARQUIS              Name: _____

STATE OF __Virginia_____ )
                                                              ) ss:
COUNTY OF ___Fairfax_____ )

I, ____Mekdim Yemane_____ a Notary Public, do hereby certify that on this 16th day of __March____ 2022, appeared before me, CORY SHANNON MARQUIS & BECKIE JO MARQUIS _____, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the foregoing Addendum, and swore and acknowledged to me that (s)he executed the same by and in the name of principal of Merchant for the purpose and in the capacity therein expressed, and in his/her individual capacity as Guarantor, and that the statements contained therein are true and correct.

Notary Signature: _Mekdim Yemane_
Name of Notary: __Mekdim Yemane__
Notary Commission Expires: ___08/31/2024___

Notarized online using audio-video communication

Mekdim Yemane
REGISTRATION NUMBER
7907050
COMMISSION EXPIRES
August 31, 2024

2

# CERTIFICATE OF SERVICE

I, Natasha Prinzing Jones, hereby certify that I have served true and accurate copies of the foregoing Complaint - Complaint to the following on 04-21-2023:

Natasha Prinzing Jones (Attorney)
PO Box 9199
Missoula MT 59807
Service Method: eService
E-mail Address: npjones@boonekarlberg.com

Elliott David McGill (Attorney)
201 West Main Street, Suite 300
P.O. Box 9199
Missoula MT 59802
Service Method: eService
E-mail Address: emcgill@boonekarlberg.com

Electronically signed by Nicole Schreckendgust on behalf of Natasha Prinzing Jones
Dated: 04-21-2023